**James E. ZECHMAN, Plaintiff,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant.**

No. 89 C 2470.

United States District Court, N.D. Illinois, E.D.

March 28, 1990.

On Motion for Reconsideration June 26, 1990.

Paul J. Petit, Steven R. Peltin, Altheimer & Gray, Chicago, Ill., for plaintiffs.

Warren S. Radler, Dale R. Crider, David M. Zinder, Rivkin, Radler, Dunne & Bayh, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff James E. Zechman ("Zechman"), a former employee of defendant Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"), brings this action seeking relief on a variety of theories for injuries he allegedly suffered incident to his discharge from Merrill Lynch in August, 1988. Before this court are two motions of the defendant: the first seeking dismissal of five of Zechman's eight counts for failure to state a claim and the second requesting this court to compel arbitration of all claims that are not dismissed. For the reasons set forth below, the motion to dismiss is granted in part and denied in part, and the motion to compel arbitration is granted.

## FACTS

Plaintiff Zechman was employed by Merrill Lynch, a corporation in the business of trading securities and offering investment advice, as a trader on the Chicago Board of Trade ("CBOT")[1] for twelve years until he was discharged on August 30, 1988. In his complaint, Zechman alleges that his discharge from employment with Merrill

---

1. At the time of his discharge, Zechman held the position of Manager, Senior Trader, Proprietary Trading Unit, Chicago Board of Trade.

Lynch coincided with his objections to several Merrill Lynch practices. Shortly before his discharge, Zechman alleges, he was instructed to participate in a scheme that demoted some employees who had enjoyed membership interest to floor clerks while permitting them to continue trading as principals, brokering for others, and soliciting orders. Perceiving this practice to run afoul of four rules of the CBOT [2] as well as of two provisions of the United States Code regulating commodity exchanges, Zechman refused to follow these instructions. Around the same time, Zechman also became aware of a scheme by which transactions involving Merrill Lynch Government Securities—a subsidiary of defendant Merrill Lynch and a non-member of the CBOT—were channelled through Merrill Lynch, a member of the CBOT. For each of these transactions the CBOT received an Exchange Service Fee of $.04, which corresponds to the transaction fee that member firms are charged, rather than $1.00, which is the fee assessed on non-members.[3] After learning of this scheme, Zechman alleges that he articulated his objections to his superiors at Merrill Lynch, demanded that it be stopped, and advised them that it had to be reported to the CBOT. Merrill Lynch did not discontinue its untoward conduct, Zechman alleges; rather, it fired him in retaliation for his "troublemaking."

Out of these facts grow Zechman's eight counts. In Count I he alleges the tort of retaliatory discharge; Count II seeks relief on a *quantum meruit* theory for the 1988 bonus allegedly earned by Zechman before his discharge; Count III seeks relief for the same bonus but is based on a theory of implied contract; Count IV alleges that Merrill Lynch's refusal to pay this bonus violates a covenant of good faith and fair dealing implied in the bonus contract between Merrill Lynch and Zechman; Counts V and VI both seek damages corresponding to unpaid vacation and personal days—the former based on a breach of contract theory and the latter on the Illinois Wage Payment and Collection Act; Count VII alleges that Zechman was defamed by a statement conveyed by a series of acts performed by Merrill Lynch in connection with the discharge; and Count VIII alleges that the same series of acts gives rise to the tort of false-light privacy. Merrill Lynch asks this court to dismiss Counts I, II, IV, VII, and VIII for failure to state a claim on which relief can be granted, Fed.R.Civ.P. 12(b)(6). Merrill Lynch also moves to compel arbitration, however, and because this latter motion may determine whether we have to decide the 12(b)(6) motion with respect to some or all of the claims, we turn to the arbitration motion first.

## DISCUSSION

### A. *Arbitration*

As members of the Chicago Board of Trade, Zechman and Merrill Lynch are bound by CBOT Rule 600.00, which provides:

> Any controversy between parties who are members and which arises out of the Exchange business of such parties shall, at the request of any such party, be submitted to arbitration in accordance with regulations prescribed by the Board. Every member, by becoming such, agrees to arbitrate all such disputes with other members in accordance with this Rule and the regulations pre-

---

**2.** According to Zechman's complaint, CBOT rules limit the privilege of trading as principal, brokering, and soliciting orders to a certain class of traders. CBOT Rule 291.00 empowers those holding Governmental Instrument Markets ("GIM") membership interests to trade in the Governmental Instrument Markets; Rule 292.00 permits trading in the Index, Debt and Energy Market ("IDEM") for those holding IDEM membership interests; and Rule 293.00 allows trading in the Commodity Options Market ("COM") for those with COM membership interests. Under Rule 211.00, "associate mem-

bers" are permitted to trade in all three of these markets. Floor clerks, by contrast, are empowered by Rule 301.05 to "perform only such services and other clerical, telephone informational duties as may be specifically permitted by the Board" and are explicitly forbidden "from soliciting or accepting orders (other than in a clerical capacity) from customers of their respective employers."

**3.** CBOT Rule 450.00 sets out this two-tiered system of exchange service fees.

scribed by the Board pursuant to this Rule, and further agrees and obligates himself to abide by and perform any awards made thereunder.

In compliance with this rule, which both parties concede to be a valid arbitration agreement, Zechman filed on March 27, 1989, a statement of claim before the CBOT, thereby submitting his dispute with Merrill Lynch to arbitration. In a memorandum filed over a month later, however, Zechman urged the CBOT to accept jurisdiction only with respect to his claim for unpaid bonus and to refrain from hearing all other claims on the ground that they do not arise out of the exchange business of the parties as required by Rule 600.00. For its part, Merrill Lynch submitted to the CBOT a letter suggesting that the Arbitration Committee of the CBOT refrain from hearing Zechman's claims to "avoid even the appearance of impropriety" in light of the CBOT's "direct financial interest in the resolution of these issues." On May 12, 1989, the CBOT announced, with no explanation, that it had determined to decline jurisdiction and to dismiss Zechman's demand for arbitration. Merrill Lynch now asks this court to compel the parties to arbitrate before a neutral arbitrator all claims that survive its motion to dismiss. A court asked to enforce an arbitration agreement, however, is not empowered to rule on the merits of an arbitrable claim, see Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985),[4] and therefore we read Merrill Lynch's motion as a request to compel the arbitration of all arbitrable claims and to consider the 12(b)(6) motion only with respect to non-arbitrable claims.[5]

**4.** This limitation on the discretion of the district court is compelled by the Federal Arbitration Act, 9 U.S.C. §§ 1–14 (1988), which "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*, 470 U.S. at 218, 105 S.Ct. at 1241 (emphasis in original). Although neither Zechman nor Merrill Lynch explores in their voluminous filings the issue of the applicability of the Federal Arbitration Act, both seem to assume its relevance. In at least one case, however, the Illinois Supreme Court applied—albeit with *no* analysis—the Illinois Uniform Arbitration Act, Ill.Rev.Stat. ch. 10, ¶ 102(b) (1987), to a dispute subject to the same arbitration agreement now at issue, see *Donaldson, Lufkin & Jenrette Futures v. Barr*, 124 Ill.2d 435, 125 Ill.Dec. 281, 530 N.E.2d 439 (1988), and thus the issue of the Federal Arbitration Act's applicability merits more attention than afforded by the parties.

By its own terms, the Act governs every "written [arbitration] provision in any maritime transaction or a contract *evidencing a transaction* involving commerce." 9 U.S.C. § 2. While this court was unable to find any cases discussing the applicability of the Federal Arbitration Act to CBOT Rule 600.00, a line of cases treating the question in the context of the Chicago Board Options Exchange ("CBOE") arbitration agreement, which contains language nearly identical to Rule 600.00, is instructive on this issue. In *Geldermann, Inc. v. Stathis*, 177 Ill.App.3d 414, 126 Ill.Dec. 681, 532 N.E.2d 366 (1st Dist.1988), the court found the Federal Arbitration Act to apply, holding as a matter of law that the parties, both members of the CBOE, had "agreed ... to be bound by the rules of the CBOE, which includes Rule 18.1(a), providing the right to request arbitration." 177 Ill.App.3d at 419, 126 Ill.Dec. at 683, 532 N.E.2d at 368. *See also John*

*Olagues Trading Co. v. First Options of Chicago*, 588 F.Supp. 1194 (N.D.Ill.1984); *Wilcox v. Ho-Wing Sit*, 586 F.Supp. 561 (N.D.Cal.1984). Similar conclusions have been reached by courts considering the applicability of the Act to the New York Stock Exchange's arbitration agreement. In *Legg, Mason & Co. v. Mackall & Coe, Inc.*, 351 F.Supp. 1367 (D.D.C.1972), the court found an arbitration agreement, embodied in the constitution and rules of the New York Stock Exchange, to "constitute a contract between all members of the exchange with each other and with the exchange itself." Concluding that the arbitration agreement triggered the Federal Arbitration Act, the court remarked that "[t]here is no doubt that the contract between the parties to arbitrate controversies under the Constitution and Rules ... evidences a 'transaction involving commerce'." 351 F.Supp. at 1370. *See also Fleck v. E.F. Hutton Group, Inc.*, 891 F.2d 1047 (2d Cir.1989); *Corey v. New York Stock Exchange*, 691 F.2d 1205 (6th Cir.1982); *Transamerica Financial Resources v. Rondini*, 189 Ill.App.3d 853, 137 Ill.Dec. 136, 545 N.E.2d 789 (2d Dist.1989) (Federal Arbitration Act applied to arbitration agreement embodied in the Code of Arbitration Procedure of the National Association of Security Dealers). This court sees no basis on which to distinguish these analogous lines of authority.

**5.** A contrary interpretation, moreover, would likely effect a waiver of Merrill Lynch's right to request arbitration altogether, which is inconsistent with both Merrill Lynch's apparent preference for arbitration of this dispute and the federal policy favoring arbitration. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–942, 74 L.Ed.2d 765 (1983).

Zechman argues in response that Rule 600.-00 provides for arbitration before CBOT arbitrators and according to CBOT rules and regulations, and that this court lacks power to require arbitration except in conformity with these provisions. Moreover, Zechman asserts, Merrill Lynch's actions over the course of this litigation have served to waive its right to compel arbitration.

### 1. Availability of Ultra-agreement Arbitration

■ An arbitration provision, like any other binding agreement between parties, is a creature of contract, *Snyder v. Smith*, 736 F.2d 409, 419 (7th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984), and therefore a party can be compelled to arbitrate only to the extent he has so agreed. *See National Iranian Oil Co. v. Ashland Oil*, 817 F.2d 326, 335 (5th Cir.), *cert. denied*, 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987); 9 U.S.C. § 4 (empowering the court to direct a recalcitrant arbitrator "to proceed to arbitration in accordance with the terms of the agreement"). Thus, one court refused to order arbitration in Illinois where the agreement explicitly named Houston as the forum city, *Snyder*, 736 F.2d 418–20, while another declined to consolidate two arbitration proceedings involving a common party where the individual arbitration agreements contemplated separate arbitrations. *Weyerhaeuser Co. v. Western Seas Shipping Co.*, 743 F.2d 635 (9th Cir.), *cert. denied*, 469 U.S. 1061, 105 S.Ct. 544, 83 L.Ed.2d 431 (1984).

■ The unwillingness of the courts in *Snyder* and *Weyerhaeuser* to go beyond the letter of the arbitration agreement, however, did not prevent the parties in those cases from resolving their disputes through arbitration. By contrast, a refusal by this court to order arbitration before a neutral arbitrator would foreclose the possibility of arbitration altogether, for the arbitration mechanism prescribed by Rule 600.00 is unavailable due to the CBOT's decision to decline jurisdiction. This case, then, unlike *Snyder* and *Weyerhaeuser*, implicates the strong federal policy favoring arbitration, *see Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–942, 74 L.Ed.2d 765 (1983); *Societe Generale de Surveillance, S.A. v. Raytheon European Management and Systems Co.*, 643 F.2d 863, 867 (1st Cir.1981), which compels a different analytical approach to the question of whether to direct the parties to arbitrate in accordance with an ultra-agreement term.

■ Where one term of an arbitration agreement has failed, the decision between substituting a new term for the failed provision and refusing to enforce the agreement altogether turns on the intent of the parties "at the time the agreement was executed, as determined from the language of the contract and the surrounding circumstances." *Iranian Oil*, 817 F.2d at 333; *see also Chattanooga Mailers Union, Local No. 92 v. Chattanooga News–Free Press*, 524 F.2d 1305, 1315 (6th Cir.1975), *overruled on other grounds, Bacashihua v. U.S. Postal Service*, 859 F.2d 402 (6th Cir.1988). To determine this intent, courts look to the "essence" of the arbitration agreement; to the extent the court can infer that the essential term of the provision is the agreement to arbitrate, that agreement will be enforced despite the failure of one of the terms of the bargain. *See Chattanooga Mailers Union*, 524 F.2d 1305; *Erving v. Virginia Squires Basketball Club*, 349 F.Supp. 716 (E.D.N.Y.), *aff'd*, 468 F.2d 1064 (2d Cir.1972). If, on the other hand, it is clear that the failed term is not an ancillary logistical concern but rather is as important a consideration as the agreement to arbitrate itself, a court will not sever the failed term from the rest of the agreement and the entire arbitration provision will fail. *See Iranian Oil*, 817 F.2d 326. In construing arbitration agreements, courts are aided by the principle

> that "arbitration should not be denied 'unless it can be said with positive assurance that an arbitration clause is not susceptible to an interpretation which would cover the dispute at issue.'"

*Id.* at 355 (quoting *Phillips Petroleum v. Marathon Oil*, 794 F.2d 1080, 1081 (5th

Cir.1986)); *see also Snyder*, 736 F.2d at 417 ("any questions as to whether an issue is arbitrable are to be resolved in favor of arbitration").

In cases where the failed term establishes the identity of the arbitrator or arbitrators, the Federal Arbitration Act steps in to cure the defect:

> [I]f no method [for naming or appointing an arbitrator or arbitrators or an umpire] be provided [in the agreement], or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire....

9 U.S.C. § 5. The precise term that has failed in the case before this court—and thus the very applicability of § 5—is unclear; Rule 600.00 does not explicitly name the CBOT as the agreed arbitrator but rather requires merely that certain controversies "be submitted to arbitration *in accordance with regulations prescribed by the Board.*" We assume that one of these regulations directs that the dispute be referred to the CBOT's Arbitration Executive Committee and another names the arbitrator(s) or lays out the procedure for selecting him or them, but neither party provided this court with any such information. The role that the CBOT plays in a Rule 600.00 arbitration proceeding—whether it serves merely as the named arbitrator or whether it acts more as a specified tribunal implicating both venue and procedure considerations, *cf. Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)—is therefore impossible for us to determine, and we thus cannot simply quote § 5 of the Federal Arbitration Act and end our analysis there. Even assuming the nonapplicability of § 5, however, we are satisfied that Rule 600.00 is in essence an agreement to resolve disputes by arbitration and that the parties should proceed to arbitration despite the failure of one of the terms.

Nowhere in the four corners of Rule 600.00 is the CBOT named as arbitrator or even as the arbitration coordinator; its authority and jurisdiction, then, are evidently derived from independent regulations. There is therefore no assurance to new members of the CBOT, as they become bound by Rule 600.00, that arbitration proceedings mandated by the rule will involve the CBOT at all. Indeed, it is possible that the regulations in place when Merrill Lynch and/or Zechman first became members did not even contemplate the CBOT mechanism that Zechman now insists is so integral to the agreement. It hardly seems likely, then, that the notion of CBOT-coordinated arbitration proceedings motivated the arbitration agreement; the only "intent" that emerges from the face of Rule 600.00 is an intent to resolve disputes through arbitration. To be sure, Rule 600.00 provides that such arbitration should proceed subject to CBOT regulations, but this consideration seems to incorporate only the arbitration procedures of the CBOT as a general matter rather than the substance of the specific regulations in force at the time the parties agreed to abide by the rule. And certainly an order compelling the parties to proceed before a neutral arbitrator does not necessitate arbitration in contravention of those regulations. Although the role from which the CBOT has recused itself is not clear to this court, it seems quite possible that its refusal to accept jurisdiction means only that it will not *coordinate* the requested arbitration. Given this court's experience with arbitration, we suspect that, had the CBOT's participation continued, the actual arbitration power would have been vested in some independent party selected from the CBOT's list of arbitrators. To the same extent that this independent party can proceed in accordance with CBOT regulations, the "neutral arbitrators" requested by Merrill Lynch can be so bound.

*National Iranian Oil Co. v. Ashland Oil*, on which Zechman primarily relies, is readily distinguished from the instant dispute. In that case, the parties had agreed to arbitrate in Teheran, Iran, any disputes arising out of an oil contract, but the defen-

dant refused to proceed in Iran due to the Islamic revolution and the concomitant potential of danger to Americans. In refusing to compel arbitration elsewhere, the court observed that the arbitration agreement incorporated both Iranian law and Iranian institutions, and therefore the "situs selection was as important ... as the agreement to resolve disputes privately through arbitration." 817 F.2d at 334. That the failed term in the instant case was not explicitly part of the arbitration agreement already renders it a significantly less important part of the overall bargain than the venue provision in *Iranian Oil.* But even assuming parity on that level, the *Iranian Oil* case is not analogous. The venue provision there did not stand alone— it was bound together with the provisions to refer to Iranian law and institutions, neither of which was accessible to an arbitration proceeding outside Iran; this interdependence bolstered the significance of the venue term. By contrast, the non-participation of the CBOT does not have such a ricochet effect and does not alter the fundamental nature and characteristics of the anticipated arbitration. Under these circumstances, we simply cannot conclude that the parties' intent would be frustrated by an arbitration proceeding that excludes the active participation of the CBOT.

## 2. Waiver

▮▮▮ Zechman next urges this court to deny Merrill Lynch's arbitration request on the ground that it has waived its arbitration rights. A contractual creation, the right to arbitrate can be vitiated by explicit waiver of the parties or by waiver inferred by a court from surrounding circumstances. *Dickinson v. Heinold Securities,* 661 F.2d 638, 641 (7th Cir.1981); *Jones Motor Co. v. Chauffeurs, Teamsters and Helpers Local Union No. 633 of New Hampshire,* 671 F.2d 38, 42 (1st Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 257, 74 L.Ed.2d 200 (1982); *Kayne v. PaineWebber Inc.,* 684 F.Supp. 978, 980 (N.D.Ill.1988). In determining whether to infer waiver, courts generally look to whether a party has acted inconsistently with the arbitration right, considering the totality of cir-

cumstances, and whether that conduct resulted in prejudice to the opposing party, *Dickinson,* 661 F.2d at 641; *Kayne,* 684 F.Supp. at 980, but are not bound by any rigid test or strict calculus. *See Ohio–Sealy Mattress Mfg. Co. v. Kaplan,* 712 F.2d 270, 273 (7th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983). Several courts in this circuit, however, have stressed the importance of the prejudice element in the waiver determination. *See id.* at 272; *Knorr Brake Corp. v. Harbil, Inc.,* 556 F.Supp. 489, 492 (N.D.Ill.1983) ("a showing of prejudice is integral to a holding of waiver"). Because waiver too lightly inferred would clash with the overriding federal preference for arbitration, any doubts as to whether waiver has occurred should be resolved in favor of arbitration. *National Foundation for Cancer Research v. A.G. Edwards & Sons, Inc.,* 821 F.2d 772, 774 (D.C.Cir.1987); *Kayne,* 684 F.Supp. at 982. Conduct giving rise to waiver, therefore, must be unambiguously inconsistent with the right to arbitrate. *Kayne,* 684 F.Supp. at 982.

▮▮▮ Zechman argues that a finding of waiver is justified in this case in light of two sets of inconsistent acts. Zechman points first to Merrill Lynch's 12(b)(6) motion to dismiss five counts of Zechman's complaint, all of which Merrill Lynch believes to be arbitrable, and second, to Merrill Lynch's letter to the Chicago Board of Trade Arbitration Committee, in which it suggested that the CBOT "decline to accept this arbitration and permit the federal court case to proceed in accordance with federal law and procedures." It is quite clear that a party who avails himself of judicial proceedings by asking a court to adjudicate the merits of his claims cannot, upon an adverse ruling, seek to enforce an arbitration agreement covering the dispute. *See Kayne,* 684 F.Supp. at 981; *Jones Motor,* 671 F.2d at 44; *National Foundation for Cancer Research,* 821 F.2d 772. But although Merrill Lynch attempts to assign a temporal order to its filings by asking this court first to dismiss five of the counts and then to compel arbitration on all of the *remaining* claims, we have refused to con-

sider the motions in this order. Merrill Lynch's request for arbitration, therefore, does not reflect a decision to shop for a new forum in the wake of an unfavorable judicial ruling. Nor does Merrill Lynch's motion to dismiss implicate extensive litigation activity, which has in other cases constituted grounds for default. *See Ohio–Sealy*, 712 F.2d 270 (waiver found where party seeking arbitration had engaged in extensive pretrial activities for several years); *Dickinson*, 661 F.2d at 642 (observing that discovery activity on arbitrable claims may serve to waive arbitration rights).

Merrill Lynch is hardly a pure and innocent arbitration crusader, however; its concurrent filing of a 12(b)(6) motion and a request for arbitration forced Zechman to file in this court a memorandum opposing Merrill Lynch's motion to dismiss despite the clear arbitrability of at least two of the disputed claims. Zechman complains that Merrill Lynch's actions prejudiced him by imposing on him the expense of litigating the same claims in two forums. But this simple assertion of prejudice is not sufficient to sustain a finding of waiver, and Zechman has not argued that the effort he expended in responding to the 12(b)(6) motion will not prove valuable in the arbitration proceedings. With no proof or even suggestion of duplicative expenses, we cannot find that Merrill Lynch's actions have worked any meaningful prejudice. *See Knorr*, 556 F.Supp. at 492–93. We are similarly disinclined to infer waiver from Merrill Lynch's letter to the CBOT asking it to decline jurisdiction. While that letter might have suggested to the CBOT and to Zechman that Merrill Lynch preferred to proceed in a judicial setting, Zechman has offered no evidence of prejudice resulting from this "deception." *Cf. Ohio–Sealy*, 712 F.2d at 273.

We therefore grant defendant's motion to compel arbitration before a substitute arbitrator or arbitrators. Section 5 of the Federal Arbitration Act vests this court with the authority to appoint the substitute

and further instructs that "unless otherwise provided in the agreement the arbitration shall be by a single arbitrator." Although its applicability to the present dispute is unclear, § 5 is sufficiently analogous to warrant our adoption of its principles. Neither Zechman nor Merrill Lynch has advised this court of the number of arbitrators contemplated by Rule 600.00, but we trust that that number is ascertainable by both parties. We therefore instruct the parties jointly to select a substitute arbitrator or a substitute panel of arbitrators in the same number as originally envisioned by Rule 600.00 and to submit the list to this court within 21 days. If the parties fail to agree, the court will select the arbitrator(s). Arbitration will then proceed in accordance with CBOT arbitration rules and regulations.

### 3. Arbitrability of Specific Claims

■ By its own terms, Rule 600.00 does not compel arbitration of all inter-member disputes but rather is limited to controversies that "arise[ ] out of the Exchange business of" the member parties. That both parties to this dispute are bound to arbitrate under Rule 600.00, then, does not automatically require that all of the pending claims be submitted to arbitration; the contractual nature of arbitration agreements dictates that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960); *accord National R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 759 (D.C.Cir.1988). It is the court, not the arbitrator, that decides the threshold issue of the arbitrability of individual claims, *AT & T Technologies v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *Fansteel v. Int'l Ass'n of Machinists and Aerospace Workers, Lodge No. 1777*, 708 F.Supp. 891, 895 (N.D.Ill.1989),[6]

---

**6.** Deviating slightly from this principle of arbitration, which the United States Supreme Court has deemed "undeniable," *AT & T*, 475 U.S. at

649, 106 S.Ct. at 1418, the Illinois Supreme Court held in *Donaldson, Lufkin & Jenrette Futures v. Barr*, 124 Ill.2d 435, 447–48, 125 Ill.Dec.

and therefore we now examine each of Zechman's eight claims in turn.

### a. *Retaliatory Discharge Claim*

■ Zechman's initial claim alleges that he was discharged from his employment with Merrill Lynch in retaliation for his objections to several of its practices. These practices clearly implicate Merrill Lynch's "exchange business"; Zechman charges first that Merrill Lynch violated the CBOT's rules limiting trading privileges to those with certain memberships by permitting floor clerks to trade as principals, and second, that Merrill Lynch avoided a $.96 non-member surcharge by masterminding a scheme under which transactions involving Merrill Lynch Government Securities—a subsidiary of defendant Merrill Lynch and a non-member of the CBOT—were channelled through Merrill Lynch, a member of the CBOT. But these practices are merely a component of the retaliatory discharge claim, and, although the claim unambiguously *relates* to exchange business by virtue of these underlying practices, the question of whether it *arises out of* such business requires a more searching inquiry. *Cf. Mediterranean Enterprises v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir.1983) (arbitration agreement covering disputes "arising under" a contract is narrower than one governing disputes "arising out of or relating to" the contract); *Genesco, Inc. v. Kakiuchi & Co.*, 815 F.2d 840 (2d Cir.1987) (same).

Relying on several Second Circuit cases, Zechman asserts that the retaliatory discharge claim is non-arbitrable because it involves the "wholly unexpected tortious conduct" of Merrill Lynch. But the cases cited by Zechman involve arbitration clauses providing for the arbitration of all disputes arising in connection with a *contract* between the parties. *See Fuller v. Guthrie*, 565 F.2d 259 (2d Cir.1977); *McMahon v. RMS Electronics*, 618 F.Supp. 189 (S.D. N.Y.1985). The bias against tort claims may simply not be appropriate where, as here, the parties agree to arbitrate all claims arising out of the parties' exchange *activities*. Moreover, a careful reading of *Fuller* and *McMahon* reveals that the "unexpected tortious behavior" language set forth in *Fuller*, 565 F.2d at 261, was not intended to delineate a sweeping category of claims excluded from arbitration. Indeed, those cases themselves concede that a claim will not be deemed non-arbitrable merely because it sounds in tort. *Fuller*, 565 F.2d at 261; *McMahon*, 618 F.Supp. at 191. Rather, that language was included in *Fuller* to explain why the particular arbitration clause at issue—an agreement to submit to arbitration all disputes involving defendant Arlo Guthrie's musical services arising out of or in connection with the contract—did not cover the dispute, a slander claim wholly unrelated to Guthrie's musical services.[7]

That the alleged retaliatory discharge was unexpected and tortious, then, does not render the claim non-arbitrable. Zechman's proffered "test" of arbitrability neglects to consider the only relevant question—whether the claim arises out of the exchange business of the parties. As every student of the federal court system is aware, the phrase "arising out of" is susceptible to widely varying definitions—even within a single context. *See* M. Bator, P. Mishkin, D. Meltzer & D. Shapiro, *Hart and Wechsler's the Federal Courts and the Federal System* 960–1040 (3d ed. 1988) (exploring constitutional "arising under" and the much narrower statutory "arising under" in the context of federal question

---

281, 287, 530 N.E.2d 439, 445 (1988), that "the question of substantive arbitrability should initially be decided by the arbitrator" where "the language of an arbitration clause is broad and it is unclear whether the subject matter of the dispute falls within [its] scope." This pronouncement, however, is predicated on the applicability of the Illinois Uniform Arbitration Act, which, in the present case, is superseded by the Federal Arbitration Act. *See supra* note 4.

7. This categorical exclusion of tort claims is additionally inconsistent with at least one court's treatment of Rule 600.00. *See Geldermann, Inc. v. Mullins*, 171 Ill.App.3d 255, 121 Ill.Dec. 164, 524 N.E.2d 1212 (1st Dist.1988) (compelling arbitration on breach of fiduciary duty, misappropriation of trade secrets, conversion, fraud, and tortious interference with prospective business advantage claims).

jurisdiction). Merrill Lynch urges this court to adopt an expansive view of "arising under" for the purposes of CBOT arbitration, asserting that Rule 600.00 is triggered whenever there is a close nexus between the controversy and the parties' exchange business. Indeed, in *Geldermann, Inc. v. Mullins*, 171 Ill.App.3d 255, 121 Ill.Dec. 164, 524 N.E.2d 1212 (1st Dist. 1988), the court held arbitrable under Rule 600.00 a controversy over the proprietary interest in certain computer programs where 90% of the trades generated by those programs were executed on the CBOT.[8] The nexus between the retaliatory discharge claim and the parties' exchange business in the instant case is less attenuated than the relationship in *Geldermann:* whether Zechman's claim will succeed depends in part on the propriety of the trading practices (exchange business) of Merrill Lynch to which Zechman objected.

While Rule 600.00's "arising out of" language is susceptible to a construction requiring a more direct nexus between the disputed claim and the parties' exchange business than is presented by Zechman's retaliatory discharge count, we are inclined to interpret the rule more expansively. Certainly Zechman offers no precedent and proposes no theory suggesting that a narrow conception of the agreement is appropriate. A broad construction is clearly plausible given the vagaries of the phrase's definition and is consistent with the *Geldermann* court's understanding of the rule. To the extent that any ambiguity remains,

> [t]he [Federal] Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–942, 74 L.Ed.2d 765 (1983).

We therefore direct that Count I of Zechman's complaint be submitted to arbitration.

#### b. *Claims for Unpaid Bonus*

■ Counts II, III, and IV of Zechman's complaint, based on three different legal theories,[9] each ask for damages corresponding to the bonus allegedly earned by Zechman in 1988 prior to his termination on August 30. According to the complaint, the amount of this bonus was tied to the profits and value generated by Zechman from his activities and from the activities under his supervision; these activities directly involved trading on the CBOT. Both Zechman and Merrill Lynch assert that these claims are arbitrable, and in light of the centrality of exchange business to the calculation of Zechman's bonus, we have no trouble agreeing.

#### c. *Vacation and Personal Days Claims*

■ Count V, based on common law breach of contract, and Count VI, based on the Illinois Wage Payment and Collection Act, seek damages stemming from Merrill Lynch's failure to pay Zechman for unused vacation and personal days that he earned prior to his discharge. While one can argue that exchange business is implicated in these claims—for they are predicated on Zechman's discharge, which we found *supra* to arise out of exchange business—the connection here is considerably more attenuated than in the retaliatory discharge context. These claims turn exclusively on the independent employer-employee relationship between Zechman and Merrill Lynch, and any role that the exchange business of the parties played in the underlying discharge is merely incidental to the causes of action and far too remote to trigger Rule 600.00's arbitration mechanism. *Cf. Donaldson, Lufkin & Jenrette Futures v. Barr*, 124 Ill.2d 435, 448, 125 Ill.Dec. 281,

---

**8.** The court focused its analysis on whether arbitration was precluded by the fact that 10% of the trades generated by the programs were executed on non-CBOT exchanges and therefore fell outside the arbitration agreement. It is the underlying assumption that a dispute over the proprietary interest in a computer program is clear-ly arbitrable, apparently reached with little trouble, that is instructive in this case.

**9.** Count II asserts a claim based on a *quantum meruit* theory, Count III asserts an implied contract claim, and Count IV alleges breach of a covenant of good faith and fair dealing.

288, 530 N.E.2d 439, 446 (1988) (claims for severance pay and unpaid expenses following discharge of employee not arbitrable under Rule 600.00 because they "arose out of [plaintiff's] contract of employment with [defendant] and clearly did not 'arise out of Exchange business' ").

#### d. Defamation and False Light Privacy Claims

Zechman's final two claims are based on a series of acts, performed by his superiors at Merrill Lynch while effecting his discharge, that Zechman claims communicated the false assertion that he had been fired for committing a criminal or unethical act. Though incorrectly reasoned (Zechman relies on the "unexpected tortious conduct" logic discredited *supra* ), Zechman's characterization of these claims as non-arbitrable is sound. Like the Count V and VI claims for vacation and personal days, the defamation and privacy counts implicate the exchange business of the parties only because they are incidental to Zechman's discharge. To prevail on these counts Zechman need not establish that he was fired in retaliation for renouncing Merrill Lynch's trading practices, but rather that the defamatory message conveyed by the series of acts was false.

Finding Counts I, II, III, and IV of Zechman's complaint arbitrable, we stay the proceedings before this court on those counts pending arbitration pursuant to 9 U.S.C. § 3.[10] Merrill Lynch's motion to dismiss Counts VII and VIII remains unaffected by these arbitration proceedings, and it is to the merits of this motion that we now turn.

### B. 12(b)(6) Motion

#### 1. Count VII: Defamation

■ In connection with his discharge, Zechman alleges, Merrill Lynch (1) made, in the plain view of Merrill Lynch employees and others, an unprecedented surprise visit to Zechman's office; (2) refused to allow Zechman to speak to his staff; (3) remained with Zechman in his office while he packed up some of his personal belongings and prevented him from finishing; (4) interrogated Merrill Lynch employees and others about entries in his travel and entertainment expense account; and (5) escorted him out of the building. The cumulative impact of this series of acts, Zechman alleges, was to communicate the false and defamatory assertion that Zechman had committed a serious criminal act or substantial breach of ethics, which precipitated his discharge; Zechman charges that this assertion constitutes defamation *per se.*

■ Under Illinois common law words are actionable *per se*—that is, without proof of special damages—if they are obviously and naturally harmful. *Harris Trust and Savings Bank v. Phillips*, 154 Ill.App.3d 574, 578, 107 Ill.Dec. 315, 318, 506 N.E.2d 1370, 1373 (1st Dist.1987). Illinois courts have recognized four categories of defamation *per se:* (1) words that impute the commission of a criminal offense; (2) words that impute infection with a communicable disease; (3) words that impute an inability to perform or a want of integrity in the discharge of one's duties of office or employment; and (4) words that prejudice a party in his profession or trade. *Costello v. Capital Cities Communications*, 125 Ill.2d 402, 414, 126 Ill.Dec. 919, 924, 532 N.E.2d 790, 795 (1988); *Whitby v. Associates Discount Corp.*, 59 Ill.App.2d 337, 340, 207 N.E.2d 482, 484 (1965). While most states analyze slander claims and libel claims under different sets of standards, recognizing libel as the more serious wrong, *see* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on the Law of Torts* 785 (5th ed. 1984) ("*Prosser & Keeton* "), Illinois has rejected this bifurcated approach in favor of a single set of rules, *Harris Trust*, 154 Ill.App.3d at 579, 107 Ill.Dec. at 318, 506 N.E.2d at 1373; *Irving v. J.L. Marsh, Inc.*, 46 Ill.App.3d

---

**10.** Section 3 authorizes a district count to stay proceedings "on application of one of the parties." Although Merrill Lynch does not formally ask that we stay proceedings, we infer from its motion to compel arbitration such a request.

Moreover, Zechman suggests in his memorandum in opposition that, in the event this court compels arbitration, proceedings on the arbitrable counts be stayed.

162, 165, 4 Ill.Dec. 720, 722, 360 N.E.2d 983, 985 (3d Dist.1977); the four *per se* categories, therefore, apply both to slander and to libel actions.[11]

■ A statement will not be found defamatory *per se*, however, if it is reasonably capable of an innocent interpretation. This so-called "innocent construction rule," first enunciated in Illinois in *John v. Tribune Co.*, 24 Ill.2d 437, 181 N.E.2d 105, *cert. denied*, 371 U.S. 877, 83 S.Ct. 148, 9 L.Ed.2d 114 (1962), was modified by the Illinois Supreme Court twenty years later in *Chapski v. Copley Press*, 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195 (1982). The *Chapski* reform sought to ensure that only *reasonable* innocent constructions would remove an alleged defamatory statement from the *per se* category, *see Costello*, 125 Ill.2d at 416, 126 Ill.Dec. at 925, 532 N.E.2d at 796; the *Chapski* court directs

> that a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se.* This preliminary determination is properly a question of law to be resolved by the court in the first instance.

*Chapski*, 92 Ill.2d at 352, 65 Ill.Dec. at 888, 442 N.E.2d at 199.

■ In its motion to dismiss, Merrill Lynch asserts that Zechman's claim, which alleges *per se* defamation, falls within the purview of the innocent construction rule and is therefore non-actionable. Merrill Lynch relies on an Illinois appellate case,

*Dubrovin v. Marshall Field's & Co. Employee's Credit Union*, 180 Ill.App.3d 992, 129 Ill.Dec. 750, 536 N.E.2d 800 (1st Dist. 1989), which applied the innocent construction rule to facts very similar to those presented here. In *Dubrovin*, the plaintiff, a freshly discharged employee of Marshall Field's, was asked, in the presence of other employees, to "clean out his desk, return his credit union office keys, leave some of his personal belongings in the credit union office and leave the premises." He was then escorted to the elevator, where he was asked to surrender his building pass, and to the exit door, where a Marshall Field's security guard inspected his personal belongings. 180 Ill.App.3d at 994, 129 Ill. Dec. at 751, 536 N.E.2d at 801. In finding plaintiff's slander *per se* claim non-actionable, the court observed that the escort could have been interpreted as a courtesy and the other acts could have been innocently construed as standard Marshall Field's policy for terminated employees.[12] 180 Ill.App.3d at 997, 129 Ill.Dec. at 753, 536 N.E.2d at 803. The court concluded that "[a] witness to these statements or acts could have observed the interaction without concluding that the plaintiff was being terminated for dishonesty or lack of integrity in his employment." *Id.*

The only facts alleged by Zechman that deviate in any significant way from the *Dubrovin* fact pattern are Merrill Lynch's refusal to allow him to speak to his staff and its questioning of other employees and persons about entries in Zechman's travel and entertainment expense accounts. But these additional circumstances do not establish the ineluctable defamatory implication necessary to avoid the innocent con-

---

**11.** This merging of libel and slander in Illinois probably accounts for Zechman's failure to label one way or the other the defamation that he charges in Count VII. Although the acts that form the basis of the alleged defamation do not fall neatly in either the "written" or "spoken" camps of libel and slander respectively—and indeed are not obviously a "statement" at all—we agree with the characterization of a similar series of acts in *Dubrovin v. Marshall Field's & Co. Employee's Credit Union*, 180 Ill.App.3d 992, 129 Ill.Dec. 750, 536 N.E.2d 800 (1st Dist.1989), as slander. *See also General Motors Corp. v. Piskor*, 277 Md. 165, 352 A.2d 810 (1976) (find-

ing a series of acts to constitute slander); *Bennett v. Norban*, 396 Pa. 94, 151 A.2d 476 (1959) (same).

**12.** Mere publication of an employee's termination or suspension is not in itself defamatory, *see Goldhor v. Hampshire College*, 25 Mass. App.Ct. 716, 521 N.E.2d 1381 (1988); moreover, to be defamatory *per se,* a statement must impute "an inability to perform or a want of integrity in the discharge of one's duties of office or employment."

struction rule. Just as allowing Zechman to speak to his staff would not obviate an implication of criminal or ethical violation on the part of Zechman that would otherwise exist, refusing him the opportunity certainly does not create one. And without any indication of what was actually said during the alleged interrogation of Merrill Lynch employees and others, we cannot conclude that these conversations necessarily cast a defamatory light on the other acts connected with Zechman's discharge. Indeed, the questions may have themselves been quite benign or prefaced with exculpatory statements.

While this court recognizes that it cannot "strain[ ] to find innocent meanings," *Costello*, 125 Ill.2d at 416, 126 Ill.Dec. at 925, 532 N.E.2d at 796, the innocent interpretation that we have attached to the series of acts in this case is not merely plausible but rather well within the domain of reasonableness. To be sure, knowledge that the unannounced visit paid on Zechman was "unprecedented" might have rendered the ensuing acts more questionable in the minds of the observers, but this information constitutes innuendo, which cannot be considered by a court applying the innocent construction rule, *see Audition Division, Ltd. v. Better Business Bureau of Metropolitan Chicago*, 120 Ill.App.3d 254, 256, 75 Ill.Dec. 947, 950, 458 N.E.2d 115, 118 (1st Dist.1983); *Glassman v. Metropolitan Life Insurance*, 616 F.Supp. 145, 147 (N.D. Ill.1985); in *Dubrovin*, for example, the court ignored the allegation that Marshall Field's, as a matter of store policy, escorted from the building only those employees terminated for security reasons.

Although the innocent construction rule defeats a claim of defamation *per se*, it does not apply to statements alleged to be defamatory *per quod*. *Unique Concepts, Inc. v. Manuel*, 669 F.Supp. 185, 189 (N.D. Ill.1987). We therefore dismiss Count VII of Zechman's complaint but grant him leave to amend his pleading to allege defamation *per quod*.

### 2. Count VIII: False Light Privacy

Zechman's final claim, based on the same series of acts that he claims are defamatory in Count VII, alleges that Merrill Lynch's conduct placed Zechman in a false light. The false-light branch of privacy, recognized by the Illinois Supreme Court in *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill.2d 411, 128 Ill.Dec. 542, 534 N.E.2d 987 (1989), creates a cause of action for a plaintiff placed in a false light before the public where that false light is highly offensive to a reasonable person. *Lovgren*, 126 Ill.2d at 418–419, 128 Ill.Dec. at 544–45, 534 N.E.2d at 989–90; Restatement (Second) of Torts § 652E (1977). To be actionable, the statement must not merely be *published* to a third person, as in defamation, but *publicized*, which the Restatement (Second) has defined as making the matter public "by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." § 652D comment a.[13]

---

**13.** Section 652D pertains to the tort of true-light privacy, which creates liability for one who gives publicity to a matter concerning the private life of another. Although § 652E, the false-light privacy section, purports to incorporate the definition of publicity contained in § 652C, which deals with the appropriation of the name or likeness of another, it seems clear that this reference is a typographical error, for the unauthorized appropriation branch of privacy does not encompass the notion of publicity, and comment a to § 652C does not mention "publicity" but rather addresses the interest protected by this tort—"the interest of the individual in the exclusive use of his own identity." The true-light branch of privacy, by contrast, seems to embrace precisely the same concept of publicity as presented by Zechman's false-light claim.

*See* Prosser, *Privacy*, 48 Calif.L.Rev. 383, 400 (1960). Moreover, the Fifth Circuit has remarked that courts presented with false-light privacy claims have almost universally adopted the definition of publicity found in comment a to § 652D. *See Moore v. Big Picture Co.*, 828 F.2d 270, 273 (5th Cir.1987).

Although *Lovgren* does not explicitly adopt the Restatement's test for publicity, holding simply that publication of an advertisement in a local newspaper constituted sufficient publicity, the court did recognize that "the heart of th[e] tort lies in the publicity," 126 Ill.2d at 418, 128 Ill.Dec. at 544, 534 N.E.2d at 989, and the rest of the opinion reveals a heavy reliance on the Restatement's conception of the tort; it is fair,

■ Merrill Lynch argues that Zechman has not alleged sufficient publicity to state a cause of action for false-light privacy. In paragraph 46 of Count VIII, Zechman claims that the series of acts was communicated to Merrill Lynch employees in the Chicago office and to others. This statement is without doubt vague but is not wholly inappropriate at this stage in the proceedings; it certainly satisfies the liberal requirements of federal notice pleading. It may be that the statement was not sufficiently publicized, but it is premature so to rule without further development of the issue. *See Robinson v. Vitro Corp.*, 620 F.Supp. 1066, 1070 (D.Md. 1985).

■ The *Lovgren* court acknowledged that the torts of defamation and false light privacy are not entirely distinct, but neither are they coextensive. Observing that some authorities have stated that "all defamation cases can be analyzed as false-light cases, but not all false-light cases are defamation cases," the court nevertheless reserved the question of whether typical defamation restrictions and requirements apply to a false-light privacy claim. 126 Ill.2d at 421, 128 Ill.Dec. at 546, 534 N.E.2d at 991. These restrictions and requirements, however, refer to considerations such as special damages and retraction standards. Even those courts holding that defamation requirements apply to false-light privacy actions do not require that all of the elements of the tort of defamation be present for the privacy claim to be actionable; most significantly, courts universally recognize that a statement need not be defamatory for a false-light privacy action to lie. *See Douglass v. Hustler Magazine*, 769 F.2d 1128, 1134 (7th Cir.1985), *cert. denied*, 475 U.S. 1094, 106 S.Ct. 1489, 89 L.Ed.2d 892 (1986); *Cibenko v. Worth Publishers*, 510 F.Supp. 761, 766 (D.N.J.1981); *Fogel v. Forbes, Inc.*, 500 F.Supp. 1081, 1087 (E.D.Pa.1980); *Michigan United Conservation Clubs v.*

*CBS News*, 485 F.Supp. 893, 903 (W.D. Mich.1980), *aff'd*, 665 F.2d 110 (6th Cir. 1981); *Fellows v. National Enquirer*, 42 Cal.3d 234, 228 Cal.Rptr. 215, 217, 721 P.2d 97, 99 (1986); *see also* Restatement (Second) § 652E comment b (1977) ("It is not ... necessary to the action for invasion of privacy that the plaintiff be defamed. It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position."); *Prosser & Keeton* at 866. Indeed, the very language of the test adopted by *Lovgren*, "false-light highly offensive to a reasonable person," would seem to supersede the defamatory component of libel and slander. It follows, then, that the innocent construction rule, which can be recast as the "non-defamatory" construction rule, does not apply to false-light privacy actions;[14] this court must consider only whether the statement is susceptible of a false meaning that is highly offensive to a reasonable person.

In making this determination, we are not required to examine the statement stripped of innuendo,[15] *see* R. Sack, *Libel, Slander, and Related Problems* 397 (1980), and we can therefore consider Zechman's allegation that Merrill Lynch's visit to him was unprecedented. Unlike our analysis under the innocent construction rule, the relevant inquiry here is whether the statement can reasonably be construed as false and highly offensive, not whether it reasonably can be construed as innocent. While we cannot, without further indication of what was asked during the alleged interrogation of Merrill Lynch employees and others, credit Zechman's allegation that the series of acts communicated the assertion that Zechman had committed a criminal or ethical violation, we find it quite plausible, in light of the unprecedented nature of the visit and the rushed sequence of events, that the

then, to assume that the Illinois Supreme Court would espouse the Restatement's definition.

**14.** Moreover, the innocent construction rule applies only to defamation *per se*, and the *per se/per quod* distinction is not applicable to false-light privacy actions.

**15.** Whether the addition of extrinsic facts compels the pleading of special damages was not discussed by the *Lovgren* court, and, as Merrill Lynch does not broach this issue, we, too, leave it open.

series of acts conveyed the offensive message that Zechman's discharge was less than honorable (when in fact, according to Zechman, his discharge was due to his scrupulous pursuit of truth and honor). Again, this motion represents only the incipient stages of the litigation process and, as the facts are developed, they may reveal that the false and offensive message was not conveyed. We hold here, however, that as alleged, the statement is reasonably susceptible of an interpretation that renders it actionable under a false-light privacy theory.

## CONCLUSION

For the foregoing reasons, Merrill Lynch's motion to compel arbitration before a neutral arbitrator is granted. We also grant Merrill Lynch's motion to dismiss Count VII of Zechman's complaint but deny its motion to dismiss Count VIII. The parties are instructed to submit their list of substitute arbitrators to this court within 21 days.

## ON MOTION FOR RECONSIDERATION

On March 28, 1990, this court issued a memorandum and order directing the parties to arbitrate four of plaintiff James E. Zechman's ("Zechman") counts against defendant Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") and dismissing one of the remaining four counts. ("March 28 Memorandum and Order", see page 1359). The parties' attempt to select, in accordance with the March 28 order, a neutral arbitrating panel apparently broke down in its early stages, and now they are back in federal court, this time on Zechman's motion to reconsider parts of the earlier decision. In particular, Zechman challenges this court's decision to compel arbitration before a neutral panel and to refer count I to arbitration.

A. *Arbitration Before a Neutral Panel*

Although Zechman contested Merrill Lynch's original motion to compel arbitration with 84 pages of memorandum and exhibits, in discussing the procedures for arbitration involving members of the Chicago Board of Trade ("CBOT"), he provided this court only with the actual agreement to arbitrate, CBOT Rule 600.00. Now Zechman argues that this rule is only one paragraph in a "three-inch thick book of Rules and Regulations to which CBOT members agree to follow when they become members" (plaintiff's mem. at 3); he also attaches to his motion for reconsideration selected regulations representing 1/16 of an inch of this book. From Zechman's redacted version of these rules and regulations, it appears that the CBOT's decision not to accept jurisdiction over this matter meant only that the five-member arbitration panel, selected from the CBOT's 20-member arbitration committee (Regulations 610.01, 620.02C), would not hear the dispute. The failed term, then, concerns only the identity of the arbitrators. In our March 28 memorandum, we noted that § 5 of the Federal Arbitration Act vests federal courts with the authority to designate alternate arbitrator(s) where there is a "lapse in the naming of an arbitrator"; we declined to rely solely on § 5, however, remarking that "[t]he precise term that has failed in the case before this court—and thus the very applicability of § 5—is unclear." March 28 Memorandum and Order at 1365. Regrettably, although the parties have now had a second opportunity to pursue this line of argument and either encourage or contest the applicability of § 5, Zechman completely ignores it and Merrill Lynch merely cites it as an *informing* principle without offering, as we thought our earlier memorandum invited, a thorough discussion of what term had failed and whether § 5 was dispositive. We are inclined now to believe that it does govern this dispute. And where § 5 has been found to apply, courts have seemingly foregone the "intent of the agreement" inquiry of *National Iranian Oil Co. v. Ashland Oil*, 817 F.2d 326 (5th Cir.), *cert. denied*, 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987). *See Chattanooga Mailers Union, Local No. 92 v. Chattanooga News–Free Press*, 524 F.2d 1305 (6th Cir.1975), *overruled on other grounds, Bacashihua v. U.S. Postal Service*, 859 F.2d 402 (6th Cir.

1988); *Astra Footwear Indus. v. Harwyn Int'l*, 442 F.Supp. 907 (S.D.N.Y.1978).

Even without invoking § 5, however, we are satisfied that our earlier decision was correct. In that memorandum, we stated that "the decision between substituting a new term for the failed provision and refusing to enforce the agreement altogether turns on the intent of the parties 'at the time the agreement was executed, as determined from the language of the contract and the surrounding circumstances.'" March 28 Memorandum and Order at 1364 (quoting *Iranian Oil*, 817 F.2d at 333). Finding that Rule 600.00 was impelled above all by a desire to resolve disputes by arbitration, we reasoned:

> There is ... no assurance to new members of the CBOT, as they become bound by Rule 600.00, that arbitration proceedings mandated by the rule will involve the CBOT at all. Indeed, it is possible that the regulations in place when Merrill Lynch and/or Zechman first became members did not even contemplate the CBOT mechanism that Zechman now insists is so integral to the agreement. It hardly seems likely, then, that the notion of CBOT-coordinated arbitration motivated the arbitration agreement; the only "intent" that emerges from the face of Rule 600.00 is an intent to resolve disputes through arbitration. To be sure, Rule 600.00 provides that such arbitration should proceed subject to CBOT regulations, but this consideration seems to incorporate only the arbitration procedures of the CBOT as a general matter rather than the substance of the specific regulations in force at the time the parties agreed to abide by the rule.

March 28 Memorandum and Order at 1365. Zechman now argues that Rule 600.00 cannot be read independently of the other CBOT rules and regulations, which establish the CBOT Arbitration Committee and call for arbitration panels drawn from this 20-member committee. The language of Rule 600.00, however, suggests that it is the organizing principle of CBOT arbitration and that the other regulations are merely outgrowths of this central tenet:

> Every member, by becoming such, agrees to arbitrate all such disputes with other members in accordance with this Rule and the regulations *prescribed by the Board pursuant to this Rule.*

CBOT Rule 600.00 (emphasis added). Rule 600.00, then, takes on the form of the authorizing statute pursuant to which the underlying regulations are promulgated. This reading indicates that Rule 600.00 is more than "just one Rule in a three-inch thick book of Rules and Regulations to which CBOT members agree to follow when they become members." And Zechman never establishes or even asserts that the regulations that set forth the CBOT's role in Rule 600.00 arbitration were regulations in force when he and Merrill Lynch first became CBOT members.

Assuming for the sake of argument that these regulations were part of the agreement to arbitrate, we nevertheless are not persuaded that the provision calling for the CBOT-member arbitration panel is not severable from the rest of the agreement. Zechman points to the unique nature of CBOT arbitration in arguing that arbitration before a neutral panel is inconsistent with the intent of the parties at the time they entered the arbitration agreement, drawing an analogy to *Iranian Oil*. In that case, however, the failure of the venue term—designating Teheran, Iran, as the situs for arbitration proceedings—rendered the entire arbitration agreement invalid because arbitration outside of Iran made it impossible to invoke Iranian law and Iranian institutions as contemplated by the agreement. Here, by contrast, Zechman has made no showing that CBOT arbitration procedures cannot be followed by non-CBOT arbitrators; indeed, the CBOT arbitration regulations reveal that disputes between members and nonmembers are arbitrated, in accordance with CBOT regulations, by mixed panels composed partly of unassociated persons. *See* CBOT Regulations 610.03, 620.01B, 620.01C.

We are not convinced, moreover, of the alleged "unique expertise" of the CBOT Arbitration Committee. The one case Zechman relied on in contesting the original motion to compel and cites again in his

current memorandum does not, as Zechman suggests, acknowledge the expertise of the Arbitration Committee but rather sets forth the CBOT's argument that "although preexisting expertise has never been a prerequisite for arbitrators, the relationship between commodity trading [and the dispute at issue] could cause the expertise of the arbitrator to be crucial." *Donaldson, Lufkin & Jenrette Futures v. Barr,* 124 Ill.2d 435, 443, 125 Ill.Dec. 281, 284, 530 N.E.2d 439, 442 (1988). The Illinois Supreme Court did not reject this argument in *Donaldson* but neither did it endorse it, instead deciding the issue on other grounds. The second case cited by Zechman asserts that the complexities of futures trading in commodities markets may be difficult for lawyers and judges to master but nowhere suggests that CBOT arbitrators are uniquely qualified. *See Rosee v. Board of Trade of the City of Chicago,* 43 Ill.App.3d 203, 247, 1 Ill.Dec. 730, 760, 356 N.E.2d 1012, 1042 (1st Dist.1976), *cert. denied,* 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977). That member-nonmember disputes are referred to some unassociated arbitrators indicates that the Arbitration Committee does not have a monopoly on the skills necessary to arbitrate disputes arising from CBOT business. And Zechman's argument that CBOT arbitrators are uniquely qualified is further undermined by CBOT Regulation 620.03, which provides:

> Where the controversy is of a highly technical nature, if the parties desire, they may arrange between themselves for one or more Special Arbitrators to be convened by the Administrator, in which event such Special Arbitrator or Special Arbitrators shall proceed in accordance with the provisions of this Chapter.

Far from disregarding the importance of self-regulation in commodity markets, this court's March 28 decision actually promotes this principle. Adjudication in federal court, which Zechman seems to advocate, would proceed without regard to the arbitration procedures that the CBOT has instituted to govern dispute resolution. The

arbitration alternative necessarily implicates these procedures, which can be followed with or without CBOT arbitrators. The principle of self-regulation, then, bolsters the argument that Rule 600.00 is fundamentally an agreement to resolve disputes through arbitration.

Equally unconvincing is Zechman's argument that the relative low cost of arbitration before the CBOT panel indicates that the parties' agreement precludes the substitution of arbitrators. If Rule 600.00 were motivated by concerns about expenses, it follows that arbitration in any form would be preferred to litigation in federal court; arbitration, even before arbitrators paid on a *per diem* basis, is generally considered to be a cheaper and more efficient alternative to litigation. *See Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 (1974).

### B. *Arbitrability of Count I*

As a fallback argument, Zechman challenges this court's decision to refer count I, asserting a claim of retaliatory discharge, to arbitration. In our March 28 decision, we acknowledged that Rule 600.00's "arising out of" language was susceptible to a narrow and an expansive interpretation; we accorded it a fairly broad construction in light of the federal policy favoring arbitration and an Illinois Appellate Court's very expansive understanding of the Rule.[1] *See Geldermann, Inc. v. Mullins,* 171 Ill. App.3d 255, 121 Ill.Dec. 164, 524 N.E.2d 1212 (1st Dist.1988). Zechman now, as before, offers no authority suggesting that a narrow interpretation is more appropriate; instead he argues that his retaliatory discharge claim does not depend on the propriety of the trading practices of Merrill Lynch because to prevail he need only establish that he *reasonably believed* Merrill Lynch's conduct to be criminal. According to Zechman, our interpretation of Rule 600.00 would encompass an assault and battery claim by "a CBOT member who is

---

1. We note here additionally that an expansive interpretation is appropriate in light of the im-

portance of the self-regulation principle in futures markets.

assaulted after hours and away from the CBOT by a fellow member" where "the reason for the attack was a disagreement over business dealings at the CBOT" (plaintiff's mem. at 10). This argument, however, relying on the largely specious distinction between proving an actual criminal violation and proving a reasonable belief of a criminal violation, glosses over the centrality of CBOT business to the retaliatory discharge claim. To determine whether Zechman reasonably believed that Merrill Lynch was violating the criminal code, an adjudicative body would have to scrutinize the basis for this belief, which would entail Zechman's perspective and his opportunity to observe (implicating Zechman's exchange business) as well as the objective appearance of Merrill Lynch's activities (implicating Merrill Lynch's exchange business). Zechman's suggestion that exchange business provides merely the motivation for the retaliatory discharge claim and is otherwise unrelated is therefore unavailing and does not warrant disturbing our March 28 decision. His motion for reconsideration is accordingly denied.