**NEWPORT LIMITED, A Partnership in Commendam, Plaintiff–Appellee Cross–Appellant,**

v.

**SEARS, ROEBUCK AND CO., Defendant–Appellant Cross–Appellee.**

**No. 90–3559.**

United States Court of Appeals, Fifth Circuit.

Aug. 26, 1991.

Rehearing and Rehearing En Banc Denied Sept. 24, 1991.

Harry McCall, Jr., Paul A. Nalty, Jonathan C. McCall, Rebecca A. Stulb, W. Anthony Toups, III, Charles P. Blanchard, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendant-appellant cross-appellee.

George C. Freeman, III, Stephen H. Kupperman, Philip A. Wittman, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for plaintiff-appellee cross-appellant.

Before REAVLEY, POLITZ, and JOLLY, Circuit Judges.

POLITZ, Circuit Judge:

Newport Limited, a Louisiana partnership in commendam, brought suit against Sears, Roebuck and Co. alleging civil RICO violations, state-law fraud, and unfair trade practice claims. The district court dismissed the RICO claim and, declining to exercise pendent jurisdiction, dismissed without prejudice the state-law claims. *Newport Ltd. v. Sears, Roebuck & Co.*, 739 F.Supp. 1078 (E.D.La.1990). In a brief ruling after oral argument we affirmed the dismissal of the RICO claim but reversed the decision to decline to hear the state-law claims. 937 F.2d 605 (5th Cir.1991) (Table). We now assign reasons for that ruling and address the remaining issues.

### Background

The facts surrounding this litigation are detailed in the district court opinion; we relate only those facts pertinent to today's disposition. Newport owned a large tract of land in New Orleans suitable for industrial development. It hoped to make Sears its first—and centerpiece—tenant by constructing and leasing to Sears a warehouse facility. The parties began negotiations in the fall of 1983 regarding such items as the size of the warehouse and the annual rental per square foot; they differ as to the details actually agreed upon. Newport was to handle the local and federal regulatory requirements, including applications for urban development grants. In a November 1984 letter, and in a January 9, 1985 "duplication" of that earlier letter, the parties agreed to agree:

It is understood that the matters contained in this letter will form the basis of a much more detailed document, the terms and conditions of which are subject to the mutual agreement of the parties. It is not intended to be a comprehensive statement of our respective rights, duties and obligations which will be fully set forth in said document.

In the succeeding 18 or so months no more specific agreement was reached.

Newport insists this failure was the result of a calculated strategy by Sears representatives to withdraw from the transaction because of a perceived change in its warehousing needs. This strategy purportedly was guided by a four-option memorandum drafted by Sears' in-house counsel, D. Charles Houk, the gist of which was to stonewall so staunchly during negotiations, and to provide such minimal technical assistance, that Newport, rather than Sears, would lose interest and eventually withdraw from the project, taking the blame for its collapse.

Sears indicates that after a change in corporate leadership some of its priorities changed, but that it was still willing to continue the project in some form, albeit with some delay. According to Sears, the project collapsed because of Newport's resistance to changes, general uncooperativeness, and unrealistic expectations. The parties also disagree on whether a $2.48 per square foot per annum lease rate was agreed upon as a fixed rate or as a platform for adjustment based on unspecified formulae.

Newport filed suit in June 1986, asserting diversity of citizenship as the basis for jurisdiction. According to Sears, the lawsuit came without any warning or notice that the negotiations had terminated. As finally amended Newport's complaint alleged a RICO violation, together with Louisiana law claims of failure to perform in good faith and violation of the state Unfair Trade Practices and Consumer Protection Law. Sears moved to dismiss the RICO claim and sought summary judgment on the state-law claims; Newport responded to both motions. The district court dismissed the RICO claim on the merits and

dismissed without prejudice the pendent state claims, ruling that in light of the Supreme Court's recent decision in *Carden v. Arkoma Associates*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990), there was no diversity jurisdiction because Sears' state of incorporation, and the domicile of one of Newport's limited partners, was New York.[1] Both sides timely appealed.

### Analysis

We first address and summarily dispose of the RICO claim. Newport's efforts to apply RICO to the instant commercial dispute are fatally defective. We adopt as our own the insightful holding of the district court on this issue. We must address, however, the issue of diversity jurisdiction and the propriety of the refusal to hear the pendent claims.

■ Sears vigorously contends that the trial court erred in concluding that there was no diversity between Sears and Newport. Sears' contention focuses on *Carden's* discussion of *Puerto Rico v. Russell & Co.*, 288 U.S. 476, 53 S.Ct. 447, 77 L.Ed. 903 (1933), and *United Steelworkers v. R.H. Bouligny, Inc.*, 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965). *Carden* reversed a holding by this court that an Arizona limited partnership is considered for diversity purposes as residing only in the place of residence of its general partners. In reversing, the Supreme Court grouped all partnerships under the unincorporated association rubric and looked to the residence of all partners, general and limited, in determining diversity jurisdiction.

In the earlier *Russell* case, the Supreme Court had accorded a different treatment to the entity under Puerto Rican law known as a *sociedad en comandita*,[2]

---

1. The limited partner of Newport sharing New York residency with Sears' place of incorporation, the estate of Townsend Martin, has two executors, one of whom is a corporation incorporated and with a principal place of business in New Jersey; the other is an individual who is a citizen of the State of New York. The citizenship of a legal representative of an estate, while a statutorily-settled matter of law for cases commenced on or after November 19, 1988, was equally clear with respect to executors well before the recent amendment to 28 U.S.C. § 1332(c)(2). 6A C. Wright, A. Miller & M.

Kane, *Federal Practice and Procedure: Civil 2d* § 1556 (1990) ("As a result of looking to the citizenship of the real party in interest and because of the express references to them in the second sentence of Rule 17(a), federal courts have held that the citizenship of an executor, administrator, guardian, bailee, or trustee is determinative in measuring the court's jurisdiction.") (footnotes omitted).

2. The Court was actually determining an issue respecting removability of a suit against a *socie-*

which it deemed more closely analogous to a corporation than to a common-law partnership and thus viewed it, "for purposes of federal jurisdiction [no differently] than a corporation organized under that law." 288 U.S. at 482, 53 S.Ct. at 449, 77 L.Ed. at 908. The Court's theory was concisely stated by Justice Stone:

> The tradition of the common law is to treat as legal persons only incorporated groups and to assimilate all others to partnerships. The tradition of the civil law, as expressed in the Code of Puerto Rico, is otherwise. Therefore to call the *sociedad en comandita* a limited partnership in the common law sense, as the respondents and others have done, is to invoke a false analogy. In the law of its creation the *sociedad* is consistently regarded as a juridical person. It may contract, own property and transact business, sue and be sued in its own name and right.

*Id.* at 481, 53 S.Ct. at 448–49, 77 L.Ed. at 907–08.[3] The Court then listed additional characteristics of the *sociedad* akin to traditional aspects of the corporation and its relationship to its stockholders. *See infra*, note 6.

In 1965, the Court declined to extend for diversity purposes the limited holding of *Russell* when faced with the issue of the treatment of unincorporated associations in the form of trade unions. In *Bouligny*, 382 U.S. at 151, 86 S.Ct. at 275, 15 L.Ed.2d at 221, the Court noted that the "problem [*Russell*] presented was that of fitting an exotic creation of the civil law, the *sociedad en comandita*, into a federal scheme which knew it not." The Court also noted that, despite a contrary assertion of the Second Circuit (in *Mason v. American Express Co.*, 334 F.2d 392 (2d Cir.1964)), the effect of *Russell* was to constrict rather than to broaden diversity jurisdiction. Significantly,

> [a]t the time *Russell* was decided, Puerto Rico was not considered a "State" for purposes of the federal diversity jurisdiction statute. Accordingly a *sociedad*, although recognized as a citizen of Puerto Rico in *Russell*, could not avail itself of the general diversity statute.

*Bouligny*, 382 U.S. at 152 n. 10, 86 S.Ct. at 275 n. 10, 15 L.Ed.2d at 221 n. 10.

In one cryptic paragraph the *Carden* Court, while neither overruling *Russell* nor confining it to its facts, stated that it viewed that case as a rare exception to a longstanding rule.

> The one exception to the admirable consistency of our jurisprudence on this matter is *Puerto Rico v. Russell & Co.*, which held that the entity known as a *sociedad en comandita*, created under the civil law of Puerto Rico, could be treated as a citizen of Puerto Rico for purposes of determining federal court jurisdiction. The *sociedad*'s juridical personality, we said, "is so complete in contemplation of the law of Puerto Rico that we see no adequate reason for holding that the *sociedad* has a different status for purposes of federal jurisdiction than a corporation organized under that law."

494 U.S. at ——, 110 S.Ct. at 1018, 108 L.Ed.2d at 164–65 (citations and some abridgments omitted).

In its brief, Sears painstakingly points out the parallel, but not precisely identical,[4] civil-law origins of the Puerto

---

*dad* from the insular court to the United States District Court for Puerto Rico. Nonetheless, Carden considered the case relevant for purposes of determining diversity jurisdiction. 494 U.S. at —— n. 2, 110 S.Ct. at 1019 n. 2, 108 L.Ed.2d at 165 n. 2.

**3.** The Court's reference to "a limited partnership in the common law sense" is not entirely clear given that limited partnerships are in derogation of the common law, and that New York, the first American common-law jurisdiction to enact a limited partnership act (1822), modeled its statute after the French (1673) and Louisiana

(1808) *sociéte en commandite* statutes. Comment, *An Examination of Louisiana Limited Partnership—The Partnership in Commendam*, 55 Tul.L.Rev. 515, 516–17 (1981); *cf. Carden*, 494 U.S. at ——, 110 S.Ct. at 1028, 108 L.Ed.2d at 176 (O'Connor, J., dissenting) ("The Court fails to acknowledge that our modern limited partnership, like the *sociedad*, finds its origins in the civil law. The limited partnership originated in Europe in the middle ages, first appearing in France....").

**4.** *Cf.* O'Neal, *An Appraisal of the Louisiana Law of Partnership: A Comparative Law Focus on*

Rican *sociedad en comandita* and the Louisiana partnership in commendam. In doing so Sears misperceives the teaching of *Carden,* which essentially forecloses the characteristic-by-characteristic inquiry which Sears would have us undertake today.[5] The partnership in commendam concededly is very similar to the *sociedad.* But it is also similar to the limited partnerships now extant in common law jurisdictions; indeed, each of the "exotic" characteristics recognized by *Russell* as inhering in the *sociedad* is also present in limited partnerships of Louisiana's sister states within the Fifth Circuit, and, indeed, most of the other states of the Union.[6] We must note that the Civil Code of Louisiana permits partnerships to characterize themselves as "limited partnerships." Article 2838 provides that "the name must include language consisting of the words 'limited partnership' or 'partnership in commendam.' "

We recognize and are impressed by the exhaustive research and scholarly analysis of counsel for Sears but we are duty bound to apply faithfully the teaching of the majority in *Carden,* which closed its analysis of the jurisdiction issue by noting, "The *fifty States* have created, and will continue to create, a wide assortment of artificial entities possessing different powers and characteristics, and composed of various classes of members with varying degrees of interest and control." 494 U.S. at ——

---

*Source Materials and Underlying Practices (Part 1),* 9 La.L.Rev. 307, 309 (1949) ("The Louisiana law of partnership, perhaps even more than other phases of Louisiana law, is a legacy of a legal 'melting pot.' "). An example of a common-law partnership concept imported into the civilian tradition of Louisiana law is that of partnership estoppel, adopted by the Louisiana Supreme Court in 1866 in *Grieff & Byrnes v. Boudousquie & Fortier,* 18 La.Ann. 631, 89 Am. Dec. 698 (1866). O'Neal, *Appraisal* at 327.

**5.** More precisely, *Carden* reaffirmed that *Bouligny* had foreclosed such inquiry, 494 U.S. at ——, 110 S.Ct. at 1018, 108 L.Ed.2d at 164 ("The problem with this argument lies not in its logic, but in the fact that the approach it espouses was proposed and specifically rejected in *Bouligny.*").

**6.** The Court listed the following characteristics of the *sociedad:*

It may contract, own property and transact business, sue and be sued in its own name and right. Its members are not thought to have a sufficient personal interest in a suit brought against the entity to entitle them to intervene as parties defendant. It is created by articles of association filed as public records. Where the articles so provide, the *sociedad* endures for a period prescribed by them regardless of the death or withdrawal of individual members. Powers of management may be vested in managers designated by the articles from among the members whose participation is unlimited, and they alone may perform acts legally binding on the *sociedad.* Its members are not primarily liable for its acts and debts, and its creditors are preferred with respect to its assets and property over the creditors of individual members, although the latter may reach the interests of the individual members in the common capital. Although the members whose participation is unlimited are made contingently liable for the debts of the *sociedad* in the event that its assets are insufficient to satisfy them, this liability is of no more consequence for present purposes than that imposed on corporate stockholders by the statute of some states.

*Russell,* 288 U.S. at 481 (citations omitted), 53 S.Ct. at 449, 77 L.Ed. at 907–08. While these characteristics differ greatly from the common-law partnership, they are found in the modern codes which define limited partnerships. *See, e.g.,* Tex.Rev.Civ.Stat.Ann. art. 6132a–1 (West 1970 & Supp.1991) Comment of the Partnership Law Committee of the Section on Corporation, Banking and Business Law of the State Bar of Texas (citations omitted):

**Entity Nature of Limited Partnership.** The entity nature of general partnerships under Texas Uniform Partnership Act is now widely recognized. The entity nature of limited partnerships under [Texas Revised Limited Partnership Act] is even more pronounced. Limited partners are, with rare exception, not liable for partnership obligations. Neither general nor limited partners have rights in partnership as though they were not partners. Process may be served on the partnership through a general partner, a registered agent or (in some circumstances) the Secretary of State. Changes of limited partners and (in some cases) general partners may take place without dissolution of the partnership. And, reconstitution is permitted after some kinds of dissolution. Limited partners may sue derivatively to enforce rights of the partners. Reorganizations and mergers are recognized as in corporate entities. Indeed, throughout TRLPA, the limited partnership is treated as an entity rather than as an aggregate of individuals.

*See also* Miss.Code Ann. § 79–14–101 (1989 & Supp.1991); 6 Uniform Laws Annotated (1969 & Supp.1991).

(emphasis supplied), 110 S.Ct. at 1022, 108 L.Ed.2d at 169. The Court suggested that any change in the jurisdictional treatment accorded these entities should be addressed to the Congress and not the courts. We must agree with the observation of the trial court "that Louisiana, while enjoying a civilian tradition, is one of the United States. The fact that a Louisiana partnership in commendam derives from a civilian code provides no reason for treatment different from other American limited partnerships." 739 F.Supp. at 1084 n. 8. We find little support for the suggestion that the Supreme Court intended an exception for *any* entity other than a *sociedad en comandita,* especially for one which on its face is indistinguishable from an ordinary limited partnership.[7] The district court was correct in holding that *Carden* does not admit of a partnership in commendam exception to the rule that limited partnerships are to be treated for diversity purposes no differently than ordinary partnerships.

### *Pendent Jurisdiction*

 That there is no diversity jurisdiction herein and, with the advent of the dismissal of the RICO claim, no federal question jurisdiction, does not decide the pressing issue of the proper exercise of pendent jurisdiction of the state-law claims advanced along with the RICO claim. In dismissing without prejudice the state-law claims the district court cited the rubric that, "Where federal claims are dismissed before trial, pendent state claims should be dismissed as well." *Newport,* 739 F.Supp. at 1084 (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Wong v. Stripling,* 881 F.2d 200 (5th Cir.1989)). While that rule of law generally presents an appropriate course of action in many instances, it is neither absolute nor automatic. It neither directs nor guides the disposition of a case such as that at bar. As the Supreme Court noted of late:

More recently, we have made clear that this statement does not establish a mandatory rule to be applied inflexibly in all cases. The statement simply recognizes that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.

*Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (citation omitted), 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720, 730 n. 7 (1988) (*CMU*).

In *CMU,* the Court gave clear guidance to the district courts in their determination of the appropriate exercise of pendent jurisdiction pursuant to *Gibbs.*

Under *Gibbs,* a federal court should consider and weigh in each case, and at every stage of litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

*Id.* at 350, 108 S.Ct. at 618–19, 98 L.Ed.2d at 729–30. The decision to exercise or decline pendent jurisdiction is within the discretion of the district court. *Wong,* 881 F.2d at 204. In the instant case, after four years of litigation produced 23 volumes and thousands of pages of record, the preparation of a pretrial order exceeding 200 pages, over a hundred depositions, and according to counsel nearly two hundred thousand pages of discovery production, the declining to hear this case on the eve of trial constituted an abuse of the trial

---

7. *Cf. Carden,* 494 U.S. at —— n. 2, 110 S.Ct. at 1019 n. 2, 108 L.Ed.2d at 165 n. 2 ("For the reasons stated in the text, *Bouligny* considered and rejected applying *Russell* beyond its facts."); *see also id.* at ——, 110 S.Ct. at 1028, 108 L.Ed.2d at 177 (O'Connor, J., dissenting) (referring to decision as "endorsing treatment of a Puerto Rican business association as an entity while refusing to treat as an entity its virtually identical stateside counterpart....").

court's discretion.[8] None of the *Gibbs* factors—judicial economy, convenience, fairness, and comity—would be offended by the exercise of pendent jurisdiction after dismissal of the federal claim; indeed, judicial economy and convenience, state and federal, and a conscious regard for the ultimate interests of the litigants, counsel strongly in favor of the retention of jurisdiction. Finally, while the matters remaining in this lawsuit are solely questions of state law, they present no novel or especially unusual questions which cannot be readily and routinely resolved by the court *a 'quo.*

Hesitant though we may be in rejecting the exercise of discretionary authority by the trial court, we are compelled to do so when we consider the resources, public and private, already invested in this lawsuit, clearly distinguishing it from the ordinary cases in which the federal claims are disposed of early in the life of the litigation.[9] The district court focused this for us in referring to the "hundreds of Court hours" devoted to the case and noting that the litigation had reached "the eve of trial after years of difficult discovery." 739 F.Supp. at 1083. The order dismissing without prejudice the state-law claims is VACATED and the matter is returned to the district court for further proceedings consistent herewith.[10]

---

**8.** Counsel informs the court that prior to the dismissal there had been, *inter alia,* 157 depositions in 24 cities in 12 states; production of 211,495 documents including 63,000 by third persons; 14 motions to compel and for protective orders, 3 protective orders, and a confidentiality designation.

**9.** *Cf. Rosado v. Wyman,* 397 U.S. 397, 404–05 (footnote omitted), 90 S.Ct. 1207, 1214, 25 L.Ed.2d 442, 451 (1970):

Unlike insubstantiality, which is apparent at the outset, mootness, frequently a matter beyond the control of the parties, may not occur until after substantial time and energy have been expended looking toward the resolution of a dispute that plaintiffs were entitled to bring in a federal court.

We are not willing to defeat the commonsense policy of pendent jurisdiction—the conservation of judicial energy and the avoidance

---

of multiplicity of litigation—by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim.

**10.** Contemporaneous with its published disposition of the claims at bar, the district court also filed an order partially granting and partially denying Sears' motion to strike as privileged certain exhibits reflecting the opinion of D. Charles Houk. For the reasons stated therein that ruling is affirmed. In the published opinion, however, the district court intimated that the decision on privilege may have been influenced by its disposition of the federal RICO claim. 739 F.Supp. at 1079 n. 1. On remand, the district court is free to revisit that issue, should it choose to do so, as it may apply to the state-law claims.

