**Nadana C. KELLY, Plaintiff,**

v.

**MERCOID CORPORATION, Defendant.**

**No. 86 C 9689.**

United States District Court,
N.D. Illinois, E.D.

Sept. 27, 1991.

Claudia Oney, Chicago, Ill., for plaintiff.

Ronald J. Hein, Jr., Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Plaintiff, Nadana C. Kelly ("Kelly"), brings this action against her former employer, Mercoid Corporation ("Mercoid"). This action arises out of Kelly's discharge by Mercoid for her refusal to submit to a urinalysis test. Kelly originally filed her complaint for damages, reinstatement, backpay and other relief in the Chancery Division of the Circuit Court of Cook Coun-

ty, Illinois ("the state court"). Mercoid subsequently removed the case to this Court on two grounds: that Kelly's claims were preempted under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) ("Section 301") and that Kelly's complaint alleged a violation of the Fourth Amendment to the United States Constitution.

Kelly's complaint, as amended, consists of four counts. In Count I, Kelly alleges that Mercoid violated Kelly's right under the Fourth Amendment to the United States Constitution to be free from unreasonable search and seizure. In Count II, Kelly asserts a parallel claim under Article I, Section 6 of the Illinois Constitution. In Count III, Kelly claims that Mercoid unreasonably invaded her privacy, in violation of Article I, Section 6 of the Illinois Constitution. Finally, in Count IV, Kelly asserts a state law tort claim against Mercoid for unreasonably intruding upon Kelly's seclusion and solitude and casting her in a false light in the public eye.

Mercoid filed a motion for summary judgment as to all counts of Kelly's complaint, pursuant to Rule 56 of the Federal Rules of Civil Procedure. In its motion, Mercoid also requested an award of its attorneys' fees and costs pursuant to Rule 11 of the Federal Rules of Civil Procedure. This Court referred Mercoid's motion to Executive Magistrate Judge Lefkow for a Report and Recommendation. On February 21, 1990, the Magistrate Judge issued her report, recommending that this Court enter summary judgment in favor of Mercoid as to Count I, that Counts II through IV be remanded to the state court, and that no attorneys' fees or costs be awarded. Mercoid subsequently filed objections to the Magistrate Judge's Report and Recommendation. This Court has reviewed the parties' underlying briefs, the Magistrate Judge's Report and Recommendation, Mercoid's objections, and Kelly's response. For the reasons set forth in this opinion, we adopt in part and reject in part the Magistrate Judge's Report and Recommendation, sustain Mercoid's objections, grant Mercoid's motion for summary judgment as to all counts, and grant in part Mercoid's

request for attorneys' fees and costs under Rule 11.

## I. *Facts*

Mercoid manufactures products which require the handling of mercury, a toxic substance that is subject to standards and regulations promulgated by the Federal Occupational Safety and Health Administration ("OSHA"). Pursuant to OSHA's standards and recommendations, Mercoid adopted a policy requiring certain employees who worked with open mercury to submit to physical examinations, including urinalysis, to be performed by a medical doctor at an outside clinic, every other month.

Mercoid hired Kelly in November, 1974 as a machine operator and assembler. After approximately one and one-half years, Mercoid transferred Kelly to the setting department, where her duties included inspecting mercury in sealed tubes. Kelly remained in the setting department until on or about July, 1986, when Mercoid transferred Kelly to the tube department, where the mercury switches are manufactured.

On or about June 19, 1986, prior to Kelly's transfer to the tube department, she attended a meeting. At that meeting, Mercoid distributed to all employees in attendance, including Kelly, a document consisting of over 30 pages and entitled "Mercoid Corporation—The Safe Handling of Mercury—Instruction for Employees." Included within this document, among other things, was a three-page memorandum explaining Mercoid's policy of requiring employees who worked with open mercury to submit to physical examinations, including urinalysis. Someone from management read the entire document aloud to all employees in attendance and Kelly herself read at least the three-page memorandum contained within the document.[1] In addition, all employees, including Kelly, signed a document indicating that they had "RECEIVED AND READ THE ENGINEERING BULLETIN CONCERNING THE SAFE HANDLING OF MERCURY INSTRUCTIONS FOR EMPLOYEES."

Upon her transfer to the tube department, Kelly began performing various duties in the mercury switch manufacturing process. Kelly claims that no one ever informed her that her contact with mercury in the tube department would be any different from that in her prior department. Initially, Kelly's duties in the tube department included clipping, spot painting, soldering, and flashing mercury tubes. During her employment in this department, Kelly claims that she never saw open mercury or residue of open mercury.

On Friday, September 5, 1986, Elliot Sanoguel ("Sanoguel"), Kelly's supervisor, generally announced to Kelly and the others in her department that they were scheduled to report to Callahan Clinic on the following Monday, September 8, 1986 and reminded them to stop and pick up their urine specimen bottles. Notwithstanding this announcement and reminder, her attendance at the June 19, 1986 meeting, her admission that she read the three-page memorandum on the safe handling of mercury, and her signature indicating that she had received notice of the urinalysis testing, Kelly claims that she was unaware of any urinalysis testing requirement. Kelly also claims that she did not know that other tube department employees were undergoing urinalysis testing, nor did she know of the procedure to be followed or the reason for such testing.

The following Monday, Kelly reported to work as usual. At about 10:00 a.m., Sanoguel instructed Kelly and some of the other tube department employees to punch out and report to the clinic. After arriving at the clinic, Kelly and her co-workers signed in and Kelly noticed that her co-workers had their urine specimen bottles. When the receptionist asked Kelly for her bottle, Kelly responded that she did not have it, so the receptionist sent Kelly to see the physician. Kelly claims that she asked the nurse at the clinic for a bottle, but the nurse said that she did not have one. The physician then examined Kelly, told Kelly

---

1. For the record, we note that Kelly's deposition testimony is inconsistent as to whether she read the three-page memorandum herself. Neverthe- less, Kelly's counsel stipulated during the deposition that Kelly in fact read the three-page memorandum.

that she was fine, and released Kelly to return to work. Kelly then returned to work, but left early because she was not feeling well and was worried about her father, who was in the hospital.

On the following day, September 9, 1986, Kelly returned to work as usual and Sanoguel directed Kelly to see the Personnel Manager, John Mulcrone ("Mulcrone"). After arriving at Mulcrone's office, a meeting commenced. In addition to Kelly and Mulcrone, Ted Grzanka ("Grzanka"), the plant manager, and Jerry Kalwa ("Kalwa"), the union steward, were present. During this meeting, Mulcrone informed Kelly that she could not return to the workplace until she submitted to urinalysis, which required her to fill a gallon bottle with urine over a period of 24 hours. Kelly claims that she informed Mulcrone that she would submit to the test if it was done under medical supervision, if they would inform her of the reasons for the test, and if they would insure confidentiality.[2] Mulcrone explained to Kelly that the urine sample was needed to ensure that Kelly was not being exposed to mercury. Mulcrone and Grzanka also advised Kelly that she should have read the pamphlet they had given her, and Kelly understood that to be the pamphlet regarding mercury. The parties discussed several alternatives and failed to reach a compromise. After the meeting, Kelly left the workplace.

A few days later, Kelly telephoned OSHA and told a representative about the test. According to Kelly, the OSHA representative told her that he did not understand why Mercoid would require Kelly to submit to urinalysis when she did not work with open mercury and that he did not know why Mercoid would require Kelly to provide a full gallon of urine. During this conversation, the OSHA representative asked Kelly if she would submit to urinalysis if she could pick up the bottle directly from Callahan Clinic and then return the bottle directly to the clinic, and Kelly responded that she would do so. With Kelly's consent, the OSHA representative later telephoned Mulcrone to see if he would

agree to this arrangement. Kelly claims that on the following morning, the OSHA representative called her back and told her that Mulcrone insisted upon Kelly picking up the bottle at Mercoid's offices.

Approximately one week after the meeting held on September 9, 1986, Kalwa telephoned Kelly to inform her that Mercoid had fired her and that a grievance had been filed on her behalf. In November, 1986, a meeting was held concerning the grievance. Kelly, Mulcrone, Sanoguel, Kalwa, and Joe Needham ("Needham"), the business representative for the union, were present at this meeting. During the meeting, Kelly maintains that she reiterated her willingness to submit to the urinalysis under supervised conditions. Needham took statements from Mulcrone and Kelly, the meeting was adjourned, and another meeting was set for December 8, 1986.

Before December 8, 1986, Kelly retained her attorney and filed her complaint in the state court. At that time, Kelly's attorney took over the negotiations for Kelly, and after discussing the matter of the upcoming meeting with Kelly and learning of Kelly's desire to visit with her mother that day, Kelly's attorney advised Kelly that the December 8th meeting could be cancelled. Both Kelly's attorney and Kelly herself advised the union of the decision to cancel the meeting. The meeting was never rescheduled. On February 25, 1987, the union rendered its decision not to arbitrate Kelly's grievance.

At all times relevant to this action, Kelly was a member of Local 1031 of the International Brotherhood of Electrical Workers ("the union"). During Kelly's period of employment, the union and Mercoid had negotiated a series of collective bargaining agreements. Although the most recent collective bargaining agreement ("the agreement") between the union and Mercoid had expired on April 30, 1986, Section 2 of the agreement provided for automatic renewal from year to year thereafter unless Mercoid or the union gave notice to the other party to amend, modify, or terminate within not less than sixty days notice prior to

---

**2.** On this point, we note that Kelly vacillated in     her deposition testimony.

any expiration date. Neither party sent any such notice. On May 2, 1986, Mercoid notified the union that it would no longer collect union dues because the agreement had expired. Nevertheless, Mercoid and the union continued to follow the grievance and arbitration provisions of the expired agreement.

Indeed, in July, 1986, Kelly filed a grievance in connection with a dispute over her paycheck. The union processed that grievance according to the terms of the grievance and arbitration clause of the expired agreement. In September, 1986, Kelly again invoked the grievance and arbitration procedures of the agreement in connection with the urinalysis dispute. In addition, at all times relevant to this action, Kelly expressed complete satisfaction with the union's representation of her.

## II. *Discussion*

As the Magistrate Judge correctly noted, under Rule 56, summary judgment is appropriate only where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Guided by these standards, we evaluate Mercoid's motion.

Mercoid argues that the terms of the agreement, especially the grievance and arbitration clause, were entitled to a presumption of effectiveness and intended by the parties to be in effect. Furthermore, argues Mercoid, Kelly's claims are simply claims for breach of the agreement, which will certainly require interpretation of the agreement for resolution, and, as such, are preempted by Section 301 of the Labor Management Relations Act. According to Mercoid, because Kelly has not exhausted her grievance procedures under the agreement, nor has she alleged that the union breached its duty of fair representation, prerequisites to a suit under Section 301, Mercoid is entitled to summary judgment.

Alternatively, Mercoid contends that Counts I through III of Kelly's complaint are constitutional claims and, therefore, require governmental or state action. Because there is no such action here, Mercoid argues that Counts I through III fail on this additional ground. Finally, Mercoid asserts that summary judgment is appropriately entered on Count IV because the event which allegedly invaded Kelly's privacy never took place.

In response, Kelly argues that no agreement existed and, consequently, that Section 301 does not apply. In addition, Kelly contends that regardless of the existence of an agreement, her claims do not "require construing" the agreement and, therefore, are independent of Section 301. Finally, Kelly asserts that there is sufficient state action to sustain her constitutional claims. We address these various arguments in turn.

### A. *Existence of the Collective Bargaining Agreement*

■ As an initial matter, this Court must determine whether there was a collective bargaining agreement in existence between Mercoid and the union before we reach the preemption issue. In its objections, Mercoid argues that the Magistrate Judge erroneously concluded that no agreement existed. According to Mercoid, the actions of the parties clearly manifested an intent to be bound by the grievance and arbitration provisions. Conversely, Kelly asserts that the Magistrate Judge properly concluded that no agreement existed and that Mercoid has failed to demonstrate that the parties intended the agreement to continue. We agree with Mercoid.

An examination of the agreement is enlightening. Section 2, Article 1 of the agreement provides that:

> This Agreement shall remain in full force and effect until April 30, 1986 and then shall automatically renew itself from year to year thereafter, unless the Company or the Union gives written notice to the other party to amend, modify or terminate within not less than sixty (60) days prior to any expiration date....

By its terms, the agreement was to automatically renew unless Mercoid or the union gave notice to the other party of its decision to amend, modify or terminate. No notice of termination was tendered by either party. In fact, only one event may be conceivably characterized as an amendment to the agreement. On May 2, 1986, Mercoid informed the union that it would no longer collect union dues. It is uncontroverted that this is the only change that Mercoid sought to make. It is similarly uncontroverted that the union did not seek to make any changes. Therefore, the express contractual language employed by Mercoid and the union, supports a finding of the "effectiveness" of the agreement.

Equally important, even if the agreement did expire by its terms on April 30, 1986, it is clear that the parties, by their actions, did intend to be bound by provisions of the agreement after its expiration. Stated another way, in this Court's view, the agreement remained in effect as a result of the mutual conduct of the parties. *See, e.g., United Paperworkers Int'l Union v. Wells Badger Indus., Inc.,* 835 F.2d 701 (7th Cir.1987); *Overby v. Chevron USA, Inc.,* 884 F.2d 470 (9th Cir.1989).

For example, in *Wells Badger,* the collective bargaining agreement expired on January 1, 1985. As a result of unsuccessful contract renegotiations, defendant, on February 14th, circulated a memo informing its employees that certain changes in "wages, hours and working conditions" would be made. 835 F.2d at 702. Thereafter, on February 19th, defendant circulated a second memo stating that with the exception of the specific changes contained in the first memo, "the Wages/Benefits, Hours of Work and Work Rules will remain the same as they were prior to February 14th, 1985." 835 F.2d at 702. During this period of time, the arbitration provision was not in issue. 835 F.2d at 702–03. Approximately seven months later, on September

24, 1985, a union member was discharged on the basis of the new attendance policy implemented by defendant after the contract expired. 835 F.2d at 703. The union filed a grievance on behalf of the fired employee, and argued an interim agreement existed by virtue of the February memoranda. After the union filed the grievance, the union and defendant selected an arbitrator and set a date for arbitration. 835 F.2d at 703.

Armed with these salient facts, the Seventh Circuit concluded that the agreement remained in effect notwithstanding the express termination date. According to the Seventh Circuit, in order to establish the existence of a collective bargaining agreement, "[a]ll that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement." 835 F.2d at 704 (*quoting Capitol–Husting Co. v. NLRB,* 671 F.2d 237 (7th Cir.1982)). Guided by this standard, the Court was satisfied that the parties subsequent course of conduct was factually sufficient to objectively ascertain the parties' intent. 835 F.2d at 704. In affirming the district court's finding that both parties intended the arbitration provision to extend beyond the term of the original contract, the Seventh Circuit held that:

> Because we find that the arbitration provision of the expired collective bargaining agreement was implicitly extended past the expiration date of the agreement by the company's memos, and that the company itself acknowledged this obligation when it joined the Union in selecting an arbitrator and setting a date for arbitration, we find that no genuine issue of material fact exists as to the intent of the parties to arbitrate post-contract disputes.

*Wells Badger,* 835 F.2d at 705.[3]

In her report, the Magistrate Judge relied by analogy on *Overby v. Chevron,* and concluded that Mercoid failed to demon-

---

**3.** By the same token, in *Overby v. Chevron,* the Ninth Circuit recognized this same legal principle but concluded that, on the facts before it, there was no mutual intent on the part of the employer and the union to be bound by provisions of the expired agreement. 884 F.2d at

474. Rather, the court found that the employer's unilateral intent to be bound was insufficient. Therefore, the contract expired by its terms and was not enforceable in a Section 301 action. 884 F.2d at 474.

strate that there was a mutual intent to be bound by any of the terms of the collective bargaining agreement. We disagree. First, the union on two separate occasions after April 30, 1986 (arguably the expiration date of the agreement) invoked the grievance clause on behalf of Kelly. On or about July 18, 1986, Kelly filed a grievance with the union in connection with a dispute over her paycheck. Mercoid responded to the grievance on or about July 25, 1986. The union and Kelly did not pursue the matter. Further, in September, 1986, Kelly invoked the grievance procedure of the agreement in connection with the urinalysis dispute. With respect to this grievance, representatives from the union and Mercoid met with Kelly in an attempt to resolve the dispute.[4] Thereafter, on February 25, 1987, the union notified Kelly that it would not seek arbitration of the grievance underlying this lawsuit. As the foregoing demonstrates, the union recognized its obligations under the grievance and arbitration clause, and evidenced an intent to be bound by its terms.

Second, at no time did Mercoid ever indicate that the grievance and arbitration clause was not in effect. On the contrary, Mercoid continued to adhere to the grievance and arbitration provision without any objection to its use by the union and Kelly. Unlike *Overby*, there is no evidence which demonstrates that the parties did not intend to be bound by this clause. With the

exception of Mercoid's notice to the union that it would no longer collect union dues, there is no evidence of any other change, modification or amendment to the agreement. The lack of changes, coupled with continued adherence to the grievance and arbitration clause, clearly manifests Mercoid's intent to be bound by the provisions of the collective bargaining agreement with the sole exception of collecting union dues.

In this Court's view, it is undisputed that both the union and Mercoid have exhibited the requisite intent to be bound by the provisions of the agreement. As the Court finds that the agreement has not expired, we next address Mercoid's preemption argument under Section 301 of the Labor Management Relations Act.[5]

## B. *Preemption Under Section 301*

Section 301 provides, in pertinent part, that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties...." 29 U.S.C. § 185(a). In essence, Section 301 confers jurisdiction on the federal courts over disputes involving collective bargaining agreements and "also authorizes the courts to fashion 'a body of federal law for the enforcement of these collective bargaining agreements.'" *United Steelwork-*

---

4. On each occasion, the grievance was handled pursuant to the grievance procedure set forth in the agreement. Article 2, Section 2 of the agreement provided for a two-step grievance procedure. An employee would file a grievance with the union. The union would present the grievance to Mercoid. Within five days after presentation of the grievance, Mercoid was to respond to each grievance. The matter was then considered terminated unless Mercoid received contrary notice from the union within ten days. In the event this grievance procedure did not resolve the situation, under Article 2, Section 3 of the agreement, both the union and Mercoid had the option of requesting binding arbitration. Arbitration was not mandatory under the agreement.

5. On July 30, 1991, the Court ordered the parties to brief the applicability of the Supreme Court's recent decision in *Litton Financial Printing Div. v. NLRB*, —— U.S. ——, 111 S.Ct. 2215, 115

L.Ed.2d 177 (1991) as it relates to this issue. In *Litton*, the Court addressed and refined the presumption of "arbitrability" after the expiration of a collective bargaining agreement, as was set forth in *Nolde Bros. Inc. v. Bakery & Confectionery Workers Union*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). In *Litton*, the Court limited the *Nolde Bros.'* presumption to disputes arising under the contract. 111 S.Ct. at 2225. A post-expiration grievance arises under the contract only in three circumstances: (1) "it involves facts and occurrences that arose before expiration," (2) "where an action taken after expiration infringes a right that accrued or vested under the agreement," or (3) "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." 111 S.Ct. at 2225. For the reasons previously discussed, the Court is satisfied that the third factor is applicable to the instant case.

*ers of America v. Rawson*, 495 U.S. 362, 110 S.Ct. 1904, 1909, 109 L.Ed.2d 362 (1990) (*quoting Textile Workers v. Lincoln Mills of Alabama*, 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957)). Moreover, the preemptive force of Section 301 is very powerful as it displaces any "state-law cause of action for violation of collective bargaining agreements...." *Rawson*, 110 S.Ct. at 1909. In addition to contract claims, state law tort actions are also subject to preemption under Section 301. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 218, 105 S.Ct. 1904, 1914–15, 85 L.Ed.2d 206 (1985).

■ The Supreme Court has set forth various "tests" to determine when a cause of action will be preempted. *See Allis-Chalmers*, 471 U.S. at 213–14, 105 S.Ct. at 1912 ("... the question is whether the ... tort is sufficiently independent of federal contract interpretation to avoid pre-emption...."); *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 1885, 100 L.Ed.2d 410 (1988) ("... we hold that an application of state law is preempted by § 301 ... only if such application requires the interpretation of a collective bargaining agreement.") In other words, the preemption analysis must focus on whether the cause of action requires interpretation of the collective bargaining agreement. With these standards as our benchmark, we address the preemption issue.

Kelly argues that her privacy claims which challenge the reasonableness of Mercoid's urinalysis policy are independent of the collective bargaining agreement. According to Kelly, her claims arise under the mandate of Illinois public policy and require no interpretation of the agreement. Conversely, Mercoid asserts that Kelly's claims require an interpretation of Article I, Section 4 [6] of the collective bargaining

agreement, which authorizes Mercoid to govern the safety of its employees through its mercury testing policy.

■ Even though the agreement does not make explicit reference to Mercoid's urinalysis policy, this does not mean an interpretation of the contract is not required. *Douglas v. American Info. Tech. Corp.*, 877 F.2d 565, 572–73 (7th Cir.1989). Moreover, while Kelly's suit does not explicitly allege a breach of the agreement (perhaps artfully done to attempt to escape Section 301), in this Court's view, her claims clearly implicate and arise under the provisions of the agreement. In her amended complaint, she challenges the working conditions at Mercoid which require employees who handle open mercury to submit to urinalysis. Clearly, Mercoid has the authority under this agreement to implement reasonable rules to assure the safety and health of its employees. [7]

Numerous authorities have held that constitutional claims virtually identical to those asserted by Kelly (in Counts II and III) are preempted by Section 301. While the parties and the Magistrate Judge have not cited Seventh Circuit authority, and our own research has disclosed none, we are satisfied that analogous authority from other circuits is instructive and persuades us that Counts II and III are preempted. For example, in *Laws v. Calmat*, 852 F.2d 430 (9th Cir.1988), plaintiff argued that his right to privacy afforded him under the Constitution of the State of California was violated by defendant's unilaterally implemented mandatory urinalysis testing for drugs and alcohol. The court determined that plaintiff's claim was "substantially dependent upon" the collective bargaining agreement which governed employees' working conditions and was therefore preempted by Section 301. Thereafter, the court granted defendant's motion for sum-

---

**6.** Article I, Section 4 provides, in pertinent part, that: "It is recognized and agreed by the Company and the Union that the management of the Company is, ... vested solely in the Company and the Company, ... may ... determine work processes ... and enact Company policies ... which are not in conflict with the Agreement."

**7.** On October 2, 1987, the Board of Review of the Illinois Department of Employment Security, concluded that Kelly was properly discharged for misconduct. The Board further determined that Mercoid's urinalysis policy was reasonable as it reflected Mercoid's "desire to protect its workers from excessive exposure to mercury."

mary judgment for plaintiff's failure to exhaust his administrative remedies. *Laws,* 852 F.2d at 434. *See also Stikes v. Chevron USA, Inc.,* 914 F.2d 1265, 1270 (9th Cir.1990) (employee's action for infringement of his right to privacy in violation of the California Constitution preempted by Section 301 and dismissed on summary judgment), *cert. denied,* —— U.S. ——, 111 S.Ct. 2015, 114 L.Ed.2d 101 (1991); *Schlacter–Jones v. General Telephone,* 936 F.2d 435, 439–40 (9th Cir.1991) (same); *Jackson v. Liquid Carbonic Corp.,* 863 F.2d 111, 120–22 (1st Cir.1988) (employee's claims that his right to privacy and right to be free from unreasonable search and seizure under the Massachusetts Constitution were violated by defendant's urinalysis policy preempted by Section 301), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989).

■ Similarly, it is well-established that Count IV of Kelly's amended complaint which asserts a state law tort claim for invasion of privacy is preempted by Section 301. *See Kirby v. Allegheny Beverage Corp.,* 811 F.2d 253, 256 (4th Cir.1987); *Willis v. Reynolds Metals Co.,* 840 F.2d 254 (4th Cir.1988); *Strachan v. Union Oil Co.,* 768 F.2d 703 (5th Cir.1985).[8] Therefore, we conclude that Counts II, III and IV of Kelly's amended complaint are preempted by Section 301.[9]

■ Finally, we must address whether Kelly states a cause of action under Section 301. Generally speaking, in order to bring an action under Section 301 against an employer, a plaintiff must exhaust "any grievance or arbitration remedies provided in the collective-bargaining agreement." *Del Costello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 163, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983). Moreover, a plaintiff must establish "that the union breached its

duty of fair representation." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990). *See Del Costello,* 462 U.S. at 164–65, 103 S.Ct. at 2290–91; *Smith v. Colgate–Palmolive Co.,* 943 F.2d 764, 771 (7th Cir.1991). It is undisputed that Kelly is unable to sustain her burden. In fact, Kelly stated in her deposition that she was completely satisfied with the union's representation of her. Moreover, she does not allege in her amended complaint that she exhausted her remedies under the grievance and arbitration clause. Rather, plaintiff merely alleged that she filed a grievance with the union and that the union chose not to arbitrate. Therefore, summary judgment is granted in Mercoid's favor on Counts II, III and IV.

### C. *Count I—Fourth Amendment Claim*

■ For different reasons, summary judgment is appropriately granted in Mercoid's favor on Count I. In Count I of her amended complaint, Kelly purportedly asserts that Mercoid's urinalysis policy violated her Fourth Amendment right to be free from unreasonable search and seizure. The Magistrate Judge properly concluded that Count I was fatally defective as there was no governmental conduct. Kelly did not object to this portion of the Magistrate Judge's report. We agree with the Magistrate Judge's well-reasoned analysis that Kelly's "claim" under the Fourth Amendment is wholly deficient. Consistent with the Magistrate Judge's recommendation, we grant Mercoid's motion for summary judgment on Count I.

### D. *Deficiency of Counts II, III and IV*

■ In this Court's opinion, even if Section 301 does not preempt Kelly's claims

---

**8.** Contrary authority does exist. In *Keehr v. Consolidated Freightways,* 825 F.2d 133 (7th Cir. 1987), the Seventh Circuit held that plaintiffs' claims for invasion of privacy were not preempted by Section 301. However, the facts in *Keehr* are readily distinguishable from the instant case. In *Keehr,* plaintiff filed a tort claim against defendant as a result of a supervisor's abusive and sexually derogatory comments made regarding plaintiff's wife. Clearly, this

factual scenario did not require interpreting the labor contract. 825 F.2d at 137.

**9.** We do not reach the preemption issue with respect to Kelly's Fourth Amendment claim (Count I). As discussed more fully within this Memorandum Opinion, we agree with the Magistrate Judge that summary judgment is properly granted on this Count on alternative grounds.

under the Illinois Constitution and her tort cause of action for invasion of privacy, it would promote judicial economy and fairness to the litigants to retain supplemental jurisdiction [10] over Kelly's state law claims rather than remand to the state court. The Supreme Court in *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), set forth the various factors a district court must consider before it decides to exercise its pendent jurisdiction. A district court "should consider and weigh in each case, and at every stage of the litigation," the factors of "judicial economy, convenience, fairness, and comity." *Carnegie–Mellon*, 108 S.Ct. at 618. In our view, the traditional notions of fairness and efficiency support retaining jurisdiction. This case has been pending in federal court for over four years, discovery has been completed and this Court is fully conversant with the facts and issues of the case. Further, the issues raised by Kelly in Counts II through IV do not involve complex questions of Illinois law and may be readily resolved by the Court on Mercoid's motion for summary judgment. *Salazar v. City of Chicago*, 940 F.2d 233, 248 (7th Cir.1991); *Newport Limited v. Sears, Roebuck & Co.*, 941 F.2d 302, 307–08 (5th Cir.1991). Therefore, we address the merits of Mercoid's motion for summary judgment with respect to Counts II through IV.

### 1) Absence of Governmental Action: Counts II and III

■ In addition to being preempted by Section 301, Counts II and III are deficient in another respect—they advance no plausible theory under which state action may be found. In Count II, Kelly alleges that Mercoid violated her right under Article I, Section 6 of the Illinois Constitution to be free from unreasonable search and seizure. Similarly, in Count III, Kelly claims that Mercoid unreasonably invaded her privacy, in violation of Article I, Section 6 of the Illinois Constitution. In its underlying

briefs, and in its objections to the Magistrate Judge's report, Mercoid argues that summary judgment must be entered against Kelly on Counts II and III because she failed to allege (and indeed cannot allege) any state action.[11] In other words, Mercoid asserts that actions by a private employer to implement health and safety procedures does not offend the Illinois Constitution.

In its objections, which we sustain, Mercoid cites *Barr v. Kelso–Burnett Co.*, 106 Ill.2d 520, 88 Ill.Dec. 628, 630–31, 478 N.E.2d 1354, 1356–57 (1985) and *People v. Smith*, 72 Ill.App.3d 956, 964, 28 Ill.Dec. 766, 773, 390 N.E.2d 1356, 1363 (1st Dist. 1979). Both of these cases make patently clear that Article I, Section 6 of the Illinois Constitution protects against *governmental* action.

Counts II and III of Kelly's amended complaint are devoid of any allegations of state action for the fundamental reason that this case does not present constitutional issues. Kelly's failure to even address Mercoid's arguments on this point in her underlying response brief illustrates the frivolousness of these counts. Therefore, as Kelly has wholly failed to allege any state action which would support her claims of unreasonable search and seizure (Count II) or unreasonable invasion of privacy (Count III) in violation of Article I, Section 6 of the Illinois Constitution, summary judgment must be granted on Counts II and III.

### 2) Invasion of Privacy: Count IV

■ By the same token, summary judgment must be entered in Mercoid's favor on Count IV of Kelly's amended complaint. In Count IV, Kelly improperly combines two privacy claims and purports to assert a claim for unreasonable intrusion upon her seclusion and false lights invasion of privacy. While it is unclear which privacy cause of action Kelly asserts, it is clear to this

10. The doctrine of pendent jurisdiction was codified by Congress and is now known as "Supplemental Jurisdiction." 28 U.S.C. § 1367. The statutory prequisites for exercising supplemental jurisdiction are satisfied.

11. We note for the record, that the Magistrate Judge declined to address these arguments. Therefore, we review *de novo* the merits of Mercoid's arguments.

Court, that she has failed to allege a cognizable action under either theory.

In *Miller v. Motorola, Inc.*, 202 Ill.App.3d 976, 148 Ill.Dec. 303, 560 N.E.2d 900 (1st Dist.1990), the Illinois Appellate Court recognized that in order to establish a cognizable claim for unreasonable intrusion upon seclusion, a plaintiff must plead and prove the following elements:

(1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) the intrusion must be offensive or objectionable to a reasonable person; (3) the matter upon which the intrusion occurs must be private; and (4) the intrusion causes anguish and suffering.

*Miller*, 202 Ill.App.3d at 981, 148 Ill.Dec. at 307, 560 N.E.2d at 904. However, whether such a state created privacy right exists is a matter of contention among the Illinois Appellate Courts and this conflict has not been resolved by the Illinois Supreme Court. *Lovgren v. Citizens First Nat'l Bank*, 126 Ill.2d 411, 417, 128 Ill.Dec. 542, 544, 534 N.E.2d 987, 989 (1989); *Owusu v. Grzyb*, 749 F.Supp. 897, 907 (N.D.Ill.1990).

In this Court's opinion, Mercoid's requirement that its employees who handle open mercury submit to urinalysis testing does not constitute an unreasonable intrusion into the seclusion of another. In fact, even if the Illinois Supreme Court were to recognize such an action, Kelly would be unable to meet her burden for the simple reason that she never submitted to such a test. Obviously, therefore, she has not, and cannot, demonstrate an unauthorized intrusion. To the extent that Kelly asserts a privacy cause of action based on unreasonable intrusion, summary judgment is appropriately entered on Count IV.

Moreover, Kelly's "false lights" claim in Count IV is wholly inadequate. In *Lovgren v. Citizens First Nat'l Bank*, the Illinois Supreme Court recognized this branch of invasion of privacy as creating a cause of action where a plaintiff is placed "before the public in a false light" which would "be highly offensive to a reasonable person." *Lovgren*, 126 Ill.2d at 418–19, 128 Ill.Dec. at 546–47, 534 N.E.2d at 989–90; Restatement (Second) of Torts § 652E (1977). To be actionable the statement must be publicized. *Lovgren*, 126 Ill.2d at 418, 128 Ill.Dec. at 544, 534 N.E.2d at 989. The Restatement has defined what constitutes making a matter public "by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) Torts, § 652D comment a; *Zechman v. Merrill Lynch, Pierce, Fenner & Smith*, 742 F.Supp. 1359, 1372 (N.D.Ill. 1990).

Application of these standards to the instant case reveals that Kelly's claim is wholly inadequate. First, Kelly does not allege that Mercoid made any statements or attributed any conduct to her which would place her in a false position. Further, there is no allegation of publicity. To the extent that Count IV of Kelly's amended complaint sounds in false lights invasion of privacy, summary judgment is granted in Mercoid's favor.

### E. *Attorneys' Fees and Costs*

Finally, consistent with our decision to grant Mercoid's motion for summary judgment in its entirety, we also reject the Magistrate Judge's recommendation denying sanctions under Rule 11 of the Federal Rules of Civil Procedure. As an initial matter, the Magistrate Judge addressed the motion for sanctions only as it relates to the federal questions of preemption and search and seizure under the Fourth Amendment to the United States Constitution. Accordingly, she declined to evaluate the motion as it relates to Counts II, III and IV because she concluded that these counts should be remanded to the state court.[12]

12. However, the Magistrate Judge sternly cautioned Kelly to consider the dismissal of these counts "rather than risk sanctions under Section 2–611 of the Illinois Code of Civil Procedure." (Report and Recommendation, at 16). We agree with the Magistrate Judge that Counts II through IV of Kelly's amended complaint suffer from incurable deficiencies and are not objectively reasonable pleadings.

With respect to the preemption argument, the Magistrate Judge concluded that sanctions were inappropriate as Kelly prevailed on this point. On the other hand, even though the Magistrate Judge recognized that Count I was "not an objectively reasonable pleading," and "was obviously faulty," she did not recommend sanctions because "Mercoid's opposition to it was incidental to its main thrust, which was preemption." (Report and Recommendation at 16). We do not agree.

■ Rule 11 of the Federal Rules of Civil Procedure provides that where an attorney or a party files pleadings that are not reasonably based on the law or in fact, or a good faith argument for the extension of existing law, sanctions are appropriate for expenses incurred, including attorneys' fees. Fed.R.Civ.P. 11. For purposes of Rule 11, litigation is deemed "frivolous" where a party or his attorney fails to make a reasonable inquiry into the facts or the law. *Brown v. Fed'n of State Medical Bds.*, 830 F.2d 1429, 1435 (7th Cir.1987).

■ In this Court's view, Counts I through III of Kelly's amended complaint, which purport to allege violations of the Fourth Amendment of the United States Constitution and the Illinois Constitution, are so specious and baseless as to warrant the imposition of sanctions. It appears to this Court that Kelly made no reasonable inquiry under Rule 11. Cursory research would have clearly indicated that government action or state action is required to state cognizable claims for unreasonable search and seizure and invasion of privacy under the United States and Illinois Constitutions. *See, e.g., Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Sanders v. A.J. Canfield Co.*, 635 F.Supp. 85 (N.D.Ill.1986); *Barr v. Kelso-Burnett Co.*, 106 Ill.2d 520, 88 Ill.Dec. 628, 630–31, 478 N.E.2d 1354, 1356–57 (1985);

*People v. Smith*, 72 Ill.App.3d 956, 964, 28 Ill.Dec. 766, 773, 390 N.E.2d 1356, 1363 (1st Dist.1979). By the same token, Count IV of Kelly's amended complaint is similarly not reasonably based in law or fact. As Kelly never submitted to a urinalysis test, her argument that her privacy was invaded or an unreasonable search and seizure occurred, is fundamentally flawed. Accordingly, we reject the Magistrate Judge's recommendation to deny sanctions on these grounds.[13]

■ Conversely, in light of the fact that preemption under Section 301 is a very fluid and evolving area of the law, Kelly's position regarding Mercoid's preemption argument was not so tenuous as to warrant the imposition of sanctions. Therefore, this Court affirms that portion of the Magistrate Judge's recommendation which denied sanctions on the preemption issue.

While this Court recognizes the difficulties inherent in determining what share of Mercoid's litigation expenses are attributed to challenging Kelly's constitutional and invasion of privacy arguments in Counts I through IV, as opposed to advancing its preemption argument directed at all counts, we believe that Mercoid bears the burden of establishing with specificity the fees and costs generated in connection with the arguments raised to Kelly's constitutional and privacy claims in Counts I through IV. Therefore, we direct Mercoid to submit to this Court, on or before October 7, 1991, a petition and affidavit which accurately calculates Mercoid's *reasonable* attorneys' fees and costs only as they relate to Kelly's constitutional and privacy claims raised in Counts I through IV.[14]

### III. Conclusion

For the reasons stated in this opinion, this Court rejects that portion of Executive Magistrate Judge Lefkow's Report and

---

13. We note for the record, that before and after Mercoid filed its motion for summary judgment and sanctions, counsel for defendant in letters dated April 15, 1987 and April 27, 1987, which cited controlling precedent from the Supreme Court and Seventh Circuit, strongly urged plaintiff's attorney to withdraw her lawsuit.

14. At the outset, the Court cautions Mercoid that it will carefully scrutinize its fee petition. This Court will not award sanctions where the fees reflect an excessive expenditure of time and effort for the nature of the task performed. Accordingly, we urge Mercoid to carefully review its petition for reasonableness prior to submission to the Court.

Recommendation denying Mercoid's motion for summary judgment on Counts II, III and IV of the amended complaint and, instead, grants Mercoid's motion for summary judgment on Counts II, III and IV. The Court adopts that portion of the Magistrate Judge's Report and Recommendation granting Mercoid's motion for summary judgment on Count I. Finally, the Court rejects the Magistrate Judge's recommendation denying the imposition of sanctions against Kelly, pursuant to Rule 11 of the Federal Rules of Civil Procedure and, instead, grants in part Mercoid's request for attorneys' fees and costs under Rule 11.